Curt ANDERSEN, John Hermanson, Rebecca
Leighton Katers, Christine Fossen Rades,
National Wildlife Federation and Clean Water
Action Council of Northeastern Wisconsin, Inc.,
Petitioners-Appellants,

v.

DEPARTMENT OF NATURAL RESOURCES,
Respondent-Respondent-Petitioner.

Supreme Court

*No. 2008AP3235. Oral argument November 3, 2010.
—Decided March 23, 2011.*

2011 WI 19

(Also reported in 796 N.W.2d 1.)

*See Callaghan's Wisconsin Digest, same topic and section number.

43

For the respondent-respondent-petitioner the cause was argued by *Joanne F. Kloppenburg*, assistant attorney general, with whom on the briefs was *J.B. Van Hollen*, attorney general.

For the petitioners-appellants there was a brief by *Elizabeth Lawton, Dennis Grzezinski* and *Midwest Environmental Advocates*, Madison, and oral argument by *Carl A. Sinderbrand, Axley Brynelson LLP*, Madison.

A joint amicus curiae brief was filed by *Paul G. Kent, Stafford Rosenbaum, LLP*, Madison, *Michael McCabe* and *Susan Anthony, Milwaukee Metropolitan Sewerage District* and *Claire Silverman, League of Wisconsin Municipalities*, Madison, for Municipal Environmental Group-Wastewater Division, The League of Wisconsin Municipalities and Milwaukee Metropolitan Sewerage District.

An amicus brief was filed by *Richard J. Lewandowski, Whyte Hirschboeck Dudek S.C.*, Madison, *Todd E. Palmer, DeWitt Ross & Stevens S.C.*, Madison, *Steven Heinzen, Godfrey & Kahn S.C.*, Madison, *David R. Oberstar, Fryberger, Buchanan, Smith & Frederick, P.A.*, Duluth, and *David A. Crass, Michael Best & Friedrich LLP*, Madison for Georgia-Pacific Consumer Products, LP, Wisconsin Paper Council, Inc., Midwest Food Processors Association, Wisconsin Industrial Energy Group, Inc., Wisconsin Dairy Business Association and Lake States Lumber Association.

An amicus brief was filed by *Albert Ettinger*, admitted pro hac vice, *Environmental Law & Policy Center*, Chicago, and *Christa O. Westerberg, McGillivray Westerberg & Bender LLC*, Madison, for Wisconsin Wildlife Federation, Milwaukee Riverkeeper, Clean Wisconsin, and Sokaogon Chippewa Community of Mole Lake.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals, *Andersen v. DNR*, 2010 WI App 64, 324 Wis. 2d 828, 783 N.W.2d 877, that reversed an order of the Brown County Circuit Court[1] affirming an order of the Department of Natural Resources (DNR) which denied in part the petitioners' request for a public hearing under Wis. Stat. § 283.63 (2005–06).[2]

¶ 2. Curt Andersen, John Hermanson, Rebecca Leighton Katers, Christine Fossen-Rades, Thomas Sydow, and James L. Baldock (collectively, the petitioners), through legal counsel at Midwest Environmental Advocates, petitioned the DNR for review of a Wisconsin Pollutant Discharge Elimination System (WPDES) permit that the DNR reissued to Fort James Operating Company's (Fort James) Broadway Mill in Green Bay. The petitioners argued that the permit failed to comply with basic requirements of the Federal Water Pollution Control Act Amendments of 1972 (the Clean Water Act) and federal regulations promulgated thereunder. Pursuant to Wis. Stat. § 283.63(1)(b), the petitioners requested the DNR to hold a public hearing on their petition.

¶ 3. To the extent that the petitioners challenged the permit as being contrary to federal law, the DNR denied their request for a public hearing, concluding that a challenge made under Wis. Stat. § 283.63 must be based on Wisconsin law.

¶ 4. The petitioners, then joined by the Clean Water Action Council of Northeastern Wisconsin, Inc. and the National Wildlife Federation, (collectively,

---

[1] The Honorable Timothy A. Hinkfuss presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

CWAC) filed a petition for judicial review of the DNR's order. The circuit court affirmed.

¶ 5. CWAC then appealed to the court of appeals, which reversed. The court of appeals concluded that the DNR possesses the authority to determine whether conditions in a state-issued permit, authorized by state regulations, comply with federal law.

¶ 6. The DNR petitioned this court for review. We now reverse the decision of the court of appeals.

¶ 7. The issue in this case is whether Wis. Stat. § 283.63 requires the DNR to hold a public hearing on CWAC's petition for review of the permit reissued to Fort James' Broadway Mill when the premise of CWAC's petition is that the permit fails to comply with basic requirements of the Clean Water Act and federal regulations promulgated thereunder.

¶ 8. We conclude that Wis. Stat. § 283.63 does not require the DNR to hold a public hearing on CWAC's petition for review of the permit reissued to Fort James' Broadway Mill when the premise of CWAC's petition is that the permit fails to comply with basic requirements of the federal Clean Water Act and federal regulations promulgated thereunder. A conclusion otherwise would undermine the careful federal and state balance created by the Clean Water Act and would thwart the finality of permits properly issued under the WPDES permit program. If CWAC is entitled to a remedy, the remedy rests with the United States Environmental Protection Agency (EPA).

## I. FACTUAL BACKGROUND

¶ 9. Fort James' Broadway Mill produces tissue paper from wastepaper. The facility deinks pre- and post-consumer wastepaper and produces over a thou-

47

sand tons per day of various tissue and toweling paper. The process results in the daily discharge of several millions of gallons of treated wastewater.

¶ 10. On May 27, 2005, pursuant to Wis. Stat. § 283.39, the DNR issued a public notice of its intent to reissue to Fort James' Broadway Mill a WPDES permit regulating the discharge of pollutants into the Lower Fox River. The DNR made available the proposed permit and a Permit Reissuance Fact Sheet detailing the terms of the proposed permit. Relevant to this case, the proposed permit imposed a phosphorous effluent limitation[3] of 1.0 milligrams per liter (mg/L), compliance of which was to be determined as a rolling 12–month average. In addition, the proposed permit required Fort James' Broadway Mill to monitor its mercury discharge according to the requirements of Wis. Admin. Code § NR 106.145 (May 2005).[4]

¶ 11. The public notice advised interested persons that they had 30 days to comment on, object to, or request a public hearing on the proposed permit. *See* Wis. Stat. §§ 283.39(2), 283.49(1)(a). The public notice also explained that the EPA is allowed up to 90 days to

---

[3] An "effluent limitation," promulgated by the EPA, restricts the quantity, rate, and concentration of a specified substance discharged from a point source into navigable waters. 33 U.S.C. § 1362(11) (2001); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). A "point source" is defined as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (2001).

All subsequent references to the United States Code are to the 2001 version unless otherwise indicated.

[4] All subsequent references to the Wisconsin Administrative Code are to the May 2005 version unless otherwise indicated.

submit comments on or objections to the proposed permit. *See* 33 U.S.C. § 1342(d)(2); Wis. Stat. § 283.41(2).

¶ 12. The DNR received three comment letters on the reissuance of the permit, one of which was from Midwest Environmental Advocates. The comments by Midwest Environmental Advocates were based on both federal and state law. Specifically, Midwest Environmental Advocates commented that (1) pursuant to 40 C.F.R. § 122.44(d)(1) (2005),[5] the DNR must prepare a reasonable potential analysis to determine whether the Fort James' Broadway Mill's increase in phosphorous discharge will cause or contribute to a violation of water quality standards;[6] (2) pursuant to 40 C.F.R. § 122.45(d) and (f), the proposed permit must state the effluent limitation for phosphorous as a maximum daily and average monthly discharge limitation and in terms of a mass limit; and (3) pursuant to Wis. Admin. Code § NR 207, the DNR must perform an anti-degradation analysis to determine whether the increase in phosphorous discharge will exceed effluent limitations or violate water quality standards.

¶ 13. On June 28, 2005, the EPA requested from the DNR the full 90 days to complete its review of the proposed permit to Fort James' Broadway Mill and "to determine whether the draft permit meets the guidelines and requirements of the Clean Water Act."

¶ 14. On July 21, 2005, the EPA advised the DNR that it has reviewed the proposed permit to Fort James'

---

[5] All subsequent references to the Code of Federal Regulations are to the 2005 version unless otherwise indicated.

[6] "Water quality standards" are promulgated by the states and generally establish the designated uses for a body of water and the desired condition of that body of water based upon the designated uses. *See* 33 U.S.C. § 1313(c)(2)(A); Wis. Stat. § 281.15(1).

Broadway Mill and will not object to the reissuance of the permit as drafted. In addition, the EPA made the following request of the DNR: "When the final permit is issued, please forward one copy and any significant comments received during the public notice to this office at the above address."

¶ 15. On August 24, 2005, the DNR issued a final decision and response to comments on the permit reissuance to Fort James' Broadway Mill.[7] The DNR decided to reissue the permit as drafted, with only technical corrections. The permit was reissued effective October 1, 2005, and had an expiration date of September 30, 2010.

## II. PROCEDURAL POSTURE

¶ 16. On October 28, 2005, the petitioners, through legal counsel at Midwest Environmental Advocates, petitioned the DNR for review of the permit reissued to Fort James' Broadway Mill, pursuant to Wis.

---

[7] The DNR made the discretionary determination not to hold a public hearing on the proposed permit reissuance to Fort James' Broadway Mill. Pursuant to Wis. Stat. § 283.49(1)(b) and Wis. Admin. Code § NR 203.05(2), the DNR is required to hold a public hearing on a proposed permit or permit application only (a) if a public hearing is requested by the EPA; (b) if a public hearing is requested by any state affected by the discharge; (c) upon receipt of a petition signed by five or more persons; or (d) if the DNR determines that there is significant public interest in the permit application. Otherwise, it is within the DNR's discretion to hold a public hearing on a proposed permit or permit application. *See* Wis. Admin. Code § NR 203.05(1). In this case, only two individual persons requested a public hearing on the proposed permit reissuance to Fort James' Broadway Mill, and the DNR concluded that significant public interest in the permit reissuance was lacking.

Stat. § 283.63. The petitioners reiterated the three phosphorous allegations previously raised by Midwest Environmental Advocates during the comment period. In addition, the petitioners requested review of the permit's conditions relating to mercury, including the reasonableness of the DNR's failure (1) to perform a reasonable potential analysis to determine whether Fort James' Broadway Mill discharges mercury at a level that will cause or contribute to a violation of water quality standards under 40 C.F.R. § 122.44(d); (2) to incorporate a water quality-based effluent limit for the discharge of mercury; and (3) to require more frequent monitoring for mercury. Pursuant to Wis. Stat. § 283.63(1)(b), the petitioners requested the DNR to hold a public hearing on the issues they raised.

¶ 17. To the extent that the petitioners challenged the permit as being contrary to federal law, the DNR denied their request for a public hearing, concluding that a challenge made under Wis. Stat. § 283.63 must be based on Wisconsin law.[8] The DNR explained

---

[8] The DNR granted the petitioners' request for a public hearing with respect to the phosphorous allegation that implicated only state law. That portion of the DNR's order was not appealed.

In addition, the DNR denied the petitioners' request for a public hearing on the mercury allegations, reasoning that an issue may be raised at a public hearing under Wis. Stat. § 283.63 only if the issue was first brought up during the public comment period under Wis. Stat. § 283.39. CWAC included that portion of the DNR's order in CWAC's petition for judicial review, and the circuit court affirmed. The court of appeals reversed, concluding that "[t]he availability of a § 283.63 hearing is not dependent on whether the DNR has received notice of the petitioner's claims during the public comment period." *Andersen v. DNR*, 2010 WI App 64, ¶ 22, 324 Wis. 2d 828, 783 N.W.2d 877. The DNR did not petition this court for

51

that pursuant to its delegation agreement with the EPA, the EPA "accepts WPDES permitting as the legal surrogate for federal permitting under the Clean Water Act." Should a WPDES permit fail to comply with federal requirements, the DNR maintained that the reviewing authority rests with the EPA: the EPA has the authority to object to a state-issued permit, and the DNR may not issue a permit to which the EPA has objected. Wis. Stat. § 283.31(2)(c). The DNR informed the petitioners that the EPA reviewed the proposed permit to Fort James' Broadway Mill and did not object.

¶ 18.   On April 13, 2006, CWAC filed a petition for judicial review of the DNR's order denying the petitioners' request for a public hearing.[9] CWAC contended that it was entitled to review under Wis. Stat. § 283.63 of a WPDES permit that allegedly fails to comply with federal law.

¶ 19.   On September 29, 2008, the circuit court affirmed the DNR's order. The circuit court agreed with the DNR that only the EPA has the authority to determine whether state-issued permits comply with federal law. Like the DNR, the circuit court noted the EPA's oversight of the WPDES permit program and the fact that the EPA did not object to the permit reissuance to Fort James' Broadway Mill.

¶ 20.   CWAC appealed. On April 13, 2010, the court of appeals reversed, holding that "the DNR pos-

_____

review of the portion of the court of appeals decision that addressed whether an issue may be raised at a § 283.63 public hearing if the issue was not brought up during the public comment period under Wis. Stat. § 283.39. Accordingly, we do not address that question.

[9] CWAC also sought a judgment declaring that certain state regulations conflict with federal regulations promulgated under the Clean Water Act. CWAC later withdrew those claims.

sesses authority to determine whether provisions within a state-issued wastewater discharge permit comply with federal law." *Andersen*, 324 Wis. 2d 828, ¶ 33. The court of appeals reasoned that various provisions of Wis. Stat. ch. 283 require the DNR to comply with federal law when administering the WPDES permit program. *Id.*, ¶ 29 (citing Wis. Stat. §§ 283.001(2), 283.11(2), and 283.31(3)(d)2.). The court of appeals therefore declined to interpret chapter 283 in a manner that "would allow the DNR to determine whether rules or permit terms comply with federal law at the time of their creation, but not when challenged." *Andersen*, 324 Wis. 2d 828, ¶ 29. Moreover, the court of appeals noted that Wis. Stat. § 283.63 does not expressly restrict the scope of the public hearing to permit challenges grounded in state law. *Id.*, ¶ 30.

¶ 21. The court of appeals deemed its holding consistent with state and federal case law that "suggest[s] state administrative agencies and courts may determine the requirements of, and state compliance with, federal law." *Id.*, ¶¶ 31–32 (citing *Froebel v. Meyer*, 217 F.3d 928, 935–36 (7th Cir. 2000); *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 525 N.W.2d 723 (1995); *Hogan v. Musolf*, 163 Wis. 2d 1, 21–22, 471 N.W.2d 216 (1991); *Sewerage Comm'n of Milwaukee v. DNR*, 102 Wis. 2d 613, 627–28, 307 N.W.2d 189 (1981)).

¶ 22. In addition, the court of appeals rejected the significance of the EPA's failure to object to the permit re-issuance to Fort James' Broadway Mill. *Andersen*, 324 Wis. 2d 828, ¶ 27. Citing *Save the Bay, Inc. v. Administrator of EPA*, 556 F.2d 1282, 1286, 1294–95 (5th Cir. 1977), the court of appeals opined that the failure to object does not necessarily mean that the EPA found no violation of federal law; rather, the failure to object may

suggest that the EPA did not find a violation it deemed substantial enough to warrant a veto. *Andersen*, 324 Wis. 2d 828, ¶¶ 27–28.

¶ 23.   The DNR petitioned this court for review, which we granted on July 22, 2010.

## III.   STANDARD OF REVIEW

¶ 24.   In an administrative appeal, the scope of our review is identical to that of the circuit court and is set forth in Wis. Stat. § 227.57. *See City of La Crosse v. DNR*, 120 Wis. 2d 168, 179, 353 N.W.2d 68 (Ct. App. 1984).

¶ 25.   The extent of the agency's statutory authority is a question of law which we review independently and without deference to the agency's determination. *Wis. Power & Light Co. v. Public Serv. Comm'n*, 181 Wis. 2d 385, 392, 511 N.W.2d 291 (1994); *Rusk Cnty. Citizen Action Group, Inc. v. DNR*, 203 Wis. 2d 1, 6, 552 N.W.2d 110 (Ct. App. 1996). In this case, the DNR denied the petitioners' request for a public hearing under Wis. Stat. § 283.63 on the grounds that only the EPA has the authority to determine whether a WPDES permit comports with federal law. Because we "owe no deference to an agency's determination concerning its own statutory authority," *Wis. Power & Light*, 181 Wis. 2d at 392, we review de novo the question of whether § 283.63 requires the DNR to hold a public hearing on CWAC's petition for review.

¶ 26.   In addition, in this case, we are called upon to interpret Wis. Stat. § 283.31(3)(d)2. The interpretation of a statute and its application to undisputed facts

is a question of law that we review de novo. *DOR v. Menasha Corp.*, 2008 WI 88, ¶ 44, 311 Wis. 2d 579, 754 N.W.2d 95. While we are not bound by an agency's conclusions of law, this court has articulated three levels of deference that we may accord an agency's statutory interpretation and application: great weight deference, due weight deference, and no deference. *Id.*, ¶ 47 (citing *Racine Harley-Davidson, Inc. v. Wis. Div. of Hearings & Appeals*, 2006 WI 86, ¶ 12, 292 Wis. 2d 549, 717 N.W.2d 184). These levels of deference reflect the legislature's determination that when reviewing an agency's decision, "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it." Wis. Stat. § 227.57(10). Accordingly, the appropriate level of deference depends upon the comparative institutional qualifications and capabilities of the court and the agency. *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 14.

■■

¶ 27. We accord great weight deference to an agency's interpretation and application of a statute when the following four elements are met: (1) the legislature charged the agency with the duty of administering the statute; (2) the agency's interpretation is one of long-standing; (3) the agency employed its expertise or specialized knowledge in forming its interpretation; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute. *Menasha Corp.*, 311 Wis. 2d 579, ¶ 48. When applying great weight deference, we will sustain the agency's statutory interpretation as long as it is reasonable, even if we conclude that another interpretation is equally or more reasonable. *Id.*

¶ 28. Due weight deference is appropriate "when the agency has some experience in an area but has not developed the expertise that necessarily places it in a better position than a court to make judgments regarding the interpretation of the statute." *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 18. Thus, due weight deference is based, not on the agency's expertise, but instead on the fact that the legislature has charged the agency with enforcement of the statute. *Id.* Under the due weight standard, we will sustain the agency's statutory interpretation if it is not contrary to the statute's clear meaning and if we determine that a more reasonable interpretation does not exist. *Menasha Corp.*, 311 Wis. 2d 579, ¶ 49.

¶ 29. Finally, we accord no deference to an agency's interpretation and application of a statute when the issue is one of first impression or when the agency's position has been so inconsistent as to offer no real guidance. *Id.*, ¶ 50.

¶ 30. As the court of appeals recently observed in *Sierra Club v. DNR*, 2010 WI App 89, ¶ 27, 327 Wis. 2d 706, 787 N.W.2d 855, we frequently apply a high level of deference in complex environmental cases in which the legislature has charged the DNR with the duty of administering the applicable and highly technical statutes. In such cases, a high level of deference is appropriate because, as a general matter, the DNR is comparatively more qualified and capable than the court at making legal determinations based on the relevant technical and scientific facts. *See id.*; *Racine Harley-Davidson*, 292 Wis. 2d 549, ¶ 14. This case is no exception.

¶ 31. We conclude that the DNR's interpretation and application of Wis. Stat. § 283.31(3)(d)2. is entitled to great weight deference. The DNR meets all four elements of the great weight standard. First, the legislature has expressly charged the DNR with the duty of administering the WPDES permit program, the provisions of which are comprised in chapter 283. Wis. Stat. § 283.001(2). Second, the DNR's interpretation and application of chapter 283 (and its predecessor, Wis. Stat. ch. 147) is one of long-standing: the DNR has administered the WPDES permit program since the EPA approved the state program in 1974. *See, e.g., Sewerage Comm'n of Milwaukee*, 102 Wis. 2d at 615. Third, the DNR employed its expertise or specialized knowledge in forming its statutory interpretation and application to the permit reissued to Fort James' Broadway Mill. The DNR considered the particular and highly technical comments submitted by the three interested parties, including Midwest Environmental Advocates, and provided specific, detailed responses. Fourth, the DNR's interpretation will provide uniformity and consistency in the application of chapter 283. There are currently 1,066 WDPES wastewater permit holders: 680 municipal wastewater permittees and 386 industrial wastewater permittees. Wisconsin DNR, Current WPDES Wastewater Permit Holders, http://www.dnr.state.wi.us/org/water/wm/ww/permlists.htm (last visited Mar. 14, 2011). Each WPDES permit is issued for a term not to exceed five-years, *see* 33 U.S.C. § 1342(b)(1)(B); Wis. Stat. § 283.53(1), which means that permit reissuances are constantly on public notice and subject to comments and public hearings. *See, e.g.,* Wisconsin DNR, WPDES Permits on Public Notice, http://www.dnr.state.wi.us/org/water/wm/ww/drafts/pubnot.htm (last visited Mar. 14,

2011). The frequency with which the DNR issues and reissues WPDES permits compels a uniform and consistent application of chapter 283.

## IV. ANALYSIS

¶ 32. In Part A, we provide a brief summary of the Clean Water Act and the EPA's approval and oversight of the WPDES permit program. In Part B, we turn to the case now before this court and conclude that Wis. Stat. § 283.63 does not require the DNR to hold a public hearing on CWAC's petition for review of the permit reissued to Fort James' Broadway Mill when the premise of CWAC's petition is that the permit fails to comply with basic requirements of the federal Clean Water Act and federal regulations promulgated thereunder.

### A. The Clean Water Act and the WPDES Permit Program

¶ 33. Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a); *see also Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992). To effectuate that objective, the Clean Water Act generally prohibits the discharge of any pollutant into navigable waters except when done pursuant to a National Pollution Discharge Elimination System (NPDES) permit. *See* 33 U.S.C. § 1311(a); *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 611 (1992); *Arkansas*, 503 U.S. at 102; *Am. Paper Inst., Inc. v. U.S. EPA*, 996 F.2d 346, 348–49 (D.C. Cir. 1993). The EPA has express authority to issue NPDES permits. *See* 33 U.S.C. § 1342(a)(1); *U.S. Dep't of Energy*, 503 U.S. at 611; *Save the Bay*, 556 F.2d at 1285. The Clean Water

Act mandates that every permit contain (1) effluent limitations[10] that reflect the best practicable control technology available to achieve pollution reduction, 33 U.S.C. § 1311(b)(1)(A), and (2) any more stringent pollutant discharge limitations necessary to meet the water quality standards[11] of the applicable body of water, § 1311(b)(1)(C). *See Am. Paper Inst.*, 996 F.2d at 349.

¶ 34. The Clean Water Act also articulates Congress' policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ." 33 U.S.C. § 1251(b); *Save the Bay*, 556 F.2d at 1285. Accordingly, as recognized by the United States Supreme Court, the Clean Water Act envisions a partnership between the states and the federal government. *Arkansas*, 503 U.S. at 101; *see also United States v. Cooper*, 482 F.3d 658, 667 (4th Cir. 2007) (referring to the Clean Water Act as a "scheme of cooperative federalism"). In furtherance of that policy, the Clean Water Act empowers each state to administer "its own permit program for discharges into navigable waters within its jurisdiction . . . ." 33 U.S.C. § 1342(b); *see also Arkansas*, 503 U.S. at 102.

¶ 35. If a state wishes to administer its own permit program, the governor of that state must submit to the EPA (1) a letter requesting program approval; (2) a complete description of the proposed program; (3) a statement from the Attorney General assuring that the state's laws provide adequate authority to carry out the program; (4) a Memorandum of Agreement with the Regional Administrator of the EPA; and (5) copies of all applicable state statutes and regulations, including

---

[10] *See supra* note 3.

[11] *See supra* note 6 and *infra* note 15.

those governing state administrative procedures. 33 U.S.C. § 1342(b); 40 C.F.R. § 123.21(a).

¶ 36. 33 U.S.C. § 1342(b) sets forth the requirements that a state's proposed permit program must meet in order to gain approval by the EPA. For example, a state's proposed permit program shall not be approved if the EPA determines that adequate authority does not exist for the state to issue permits which apply, and insure compliance with, the requirements of the Clean Water Act and of 40 C.F.R. pt. 123. 33 U.S.C. § 1342(b)(1)(A), (2)(A); § 1342(c)(1); 40 C.F.R. § 123.61(b);[12] *U.S. Dep't of Energy*, 503 U.S. at 611. In particular, 40 C.F.R. § 123.25 sets forth the permitting requirements that a proposed permit program must meet. Significant to this case, 40 C.F.R. §§ 122.44 and 122.45 are included among those permitting requirements. *See* 40 C.F.R. § 123.25(a)(15), (16). If the EPA determines that the proposed permit program meets the enumerated requirements, then the EPA must approve the program. 33 U.S.C. § 1342(b). Once a state program is approved, the EPA must suspend its own issuance of NPDES permits covering the navigable waters subject to the state program. § 1342(c)(1); 40 C.F.R. § 123.61(c); *Save the Bay*, 556 F.2d at 1285.

¶ 37. The EPA approved the WPDES permit program on February 4, 1974, marking Wisconsin as the sixth state to gain authority to administer its own permit program. United States EPA, NPDES: Specific State Program Status, http://cfpub.epa.gov/npdes/statestats.

---

[12] 40 C.F.R. § 123.61(b) provides that "[w]ithin 90 days of the receipt of a complete program submission under [40 C.F.R.] § 123.21 the Administrator [of the EPA] shall approve or disapprove the program based on the requirements of this part and of [the Clean Water Act] and taking into consideration all comments received."

cfm?program_id=45&view=specific#comments (last visited Mar. 14, 2011). Currently, only four states and the District of Columbia are not authorized to administer a permit program. United States EPA, NPDES: State Program Status, http://cfpub.epa.gov/npdes/statestats. cfm (last visited Mar. 14, 2011).

¶ 38. Still, even when a state obtains approval to administer its own permit program, the EPA retains significant authority through its continuing oversight of the state's permit program. For example, a state's permit program must be revised according to changes in the controlling federal statutory or regulatory authority. *See* 33 U.S.C. § 1342(c)(2) ("Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title."); 40 C.F.R. § 123.62(a). To that end, the state must keep the EPA fully informed of any proposed modifications to its permit program. 40 C.F.R. § 123.62(a). If the EPA determines that the revisions are substantial, the EPA must issue a public notice of the revisions and provide an opportunity for comments and a public hearing. § 123.62(b)(2). The EPA then approves or disapproves the revisions based upon the requirements of 40 C.F.R. pt. 123 and of the Clean Water Act. § 123.62(b)(3).

¶ 39. In addition, the EPA has the authority to withdraw its approval of a state's permit program if the program no longer complies with the requirements of 40 C.F.R. pt. 123 and of the Clean Water Act, and if the state fails to take corrective action. 33 U.S.C. § 1342(c)(3); 40 C.F.R. § 123.63(a); *Save the Bay*, 556 F.2d at 1285. For example, the following circumstances are among those which warrant approval withdrawal: where the state's legal authority no longer meets the requirements of 40 C.F.R. pt. 123, including the state's failure to promulgate

or enact new authorities when necessary; or where the operation of the state program fails to comply with requirements of 40 C.F.R. pt. 123, including the repeated issuance of permits which do not conform to the requirements of 40 C.F.R. pt. 123. *See* § 123.63(a)(1), (2).

¶ 40.  Of relevance to this case, each state is required to send to the EPA a copy of each permit application received by the state and must provide notice to the EPA of "every action related to the consideration of such permit application, including each permit proposed to be issued by such State." 33 U.S.C. § 1342(d)(1); *see also* Wis. Stat. §§ 283.41(1), 283.43(1)(b). The EPA then has up to 90 days to comment on, object to, or make recommendations on the proposed permit. 33 U.S.C. § 1342(d)(2); 40 C.F.R. § 123.44(a)(2); Wis. Stat. § 283.41(2). 40 C.F.R. § 123.44(c) lists the valid grounds upon which the EPA may object to the issuance of a proposed permit. Those valid grounds include, *inter alia*: (1) when the proposed permit fails to apply, or to ensure compliance with, any applicable requirement of 40 C.F.R. pt. 123; (2) when a finding made by the state in connection with the proposed permit misinterprets the Clean Water Act or any guidelines or regulations thereunder, or misapplies them to the facts; (3) when any provisions of the proposed permit relating to the maintenance of records, reporting, monitoring, or sampling by the permittee are inadequate to assure compliance with permit conditions, including effluent standards and limitations, required by the Clean Water Act or any guidelines and regulations issued thereunder; or (4) when the effluent limits of the proposed permit fail to satisfy the requirements of 40 C.F.R § 122.44(d). 40 C.F.R. § 123.44(c)(1), (4), (5), (8). If the EPA objects to the issuance of a proposed permit, the state may not issue the permit as drafted. 33 U.S.C. § 1342(d)(2); Wis. Stat. § 283.31(2)(c).

¶ 41. With that context in mind, we return to the case now before this court.

### B. CWAC's Petition for Review under Wis. Stat. § 283.63 of the Permit Reissued to Fort James' Broadway Mill

¶ 42. We conclude that Wis. Stat. § 283.63 does not require the DNR to hold a public hearing on CWAC's petition for review of the permit reissued to Fort James' Broadway Mill when the premise of CWAC's petition is that the permit fails to comply with basic requirements of the federal Clean Water Act and federal regulations promulgated thereunder. We begin by describing the relevant statutes in Wis. Stat. ch. 283. We then apply the facts of this case, and in particular, the issues raised in CWAC's petition for review, to the relevant statutory authority.

### 1. Wisconsin Stat. ch. 283

¶ 43. Wisconsin Stat. ch. 283 espouses a very similar objective to that of the Clean Water Act: "to restore and maintain the chemical, physical, and biological integrity of [Wisconsin's] waters to protect public health, safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial, agricultural, and other uses of water." Wis. Stat. § 283.001(1). To effectuate that policy, the legislature granted to the DNR "all authority necessary to establish, administer and maintain a state pollutant discharge elimination system . . . consistent with all the requirements of the federal water pollution control act amendments of 1972 [the Clean Water Act]." § 283.001(2). In particular, the legislature charged the

DNR with promulgating rules on effluent limitations, standards of performance for new sources, and other effluent prohibitions and pretreatment standards. § 283.11(1). Section 283.11(2) provides generally that all such rules must comply with and not exceed the requirements of the Clean Water Act and regulations adopted thereunder.

¶ 44. Wisconsin Stat. ch. 283 also codifies the WPDES permit program. Pursuant to Wis. Stat. § 283.31(1), the discharge of any pollutant into any waters in Wisconsin is prohibited unless done according to a WPDES permit issued by the DNR. Notwithstanding certain exceptions,[13] the DNR may issue a permit for the discharge of any pollutant, or combination of pollutants, if the following requirements are met, "whenever applicable":

---

[13] Wisconsin Stat. § 283.31(2) sets forth the circumstances under which the DNR may not issue a WPDES permit:

> No permit shall be issued by the [DNR] for the discharge into the waters of the state of any of the following:
>
> (a) Any radiological, chemical or biological warfare agent or high-level radioactive waste.
>
> (b) Any discharge which the secretary of the army acting through the chief of the army corps of engineers has objected to in writing on the ground that anchorage and navigation would be substantially impaired.
>
> (c) Any discharge to which the U.S. environmental protection agency has objected to in writing pursuant to s. 283.41.
>
> (d) Any discharge from a point source which is in conflict with any existing area-wide waste treatment management plan approved by the department. No area-wide waste treatment management plan may require the abandonment of existing waste treatment facilities which meet the requirements of this chapter unless the abandonment of such facilities clearly represents the most efficient and cost-effective method of providing waste treatment for the entire planning area.

64

(a) Effluent limitations.

(b) Standards of performance for new sources.

(c) Effluent standards, effluents prohibitions and pretreatment standards.

(d) Any more stringent limitations, including those:

1. Necessary to meet federal or state water quality standards, or schedules of compliance established by the department; or

2. Necessary to comply with any applicable federal law or regulation; or

3. Necessary to avoid exceeding total maximum daily loads established pursuant to a continuing planning process developed under s. 283.83.

(e) Any more stringent legally applicable requirements necessary to comply with an approved areawide waste treatment management plan.

(f) Groundwater protection standards established under ch. 160.

§ 283.31(3).

¶ 45.   Wisconsin Stat. § 283.63 provides the procedure to which interested persons[14] may petition the DNR for review of any "denial, modification, suspension or revocation" of a WPDES permit, or of "the reasonableness of or necessity for any term or condition of any issued, reissued or modified permit." § 283.63(1). Pursuant to § 283.63(1)(b), the DNR must hold a public hearing at which the petitioner must present evidence in support of the allegations made in the petition for

---

[14] Specifically, "[a]ny permit applicant, permittee, affected state or 5 or more persons" may secure review by the DNR of a WPDES permit. Wis. Stat. § 283.63(1). In this case, CWAC qualifies as a group of "5 or more persons."

review. At the public hearing, all interested persons are given the opportunity to present facts, views, or arguments relevant to the issues raised by the petitioner. § 283.63(1)(b). Then, within 90 days of the public hearing, the DNR must issue its decision on the petition for review. § 283.63(1)(d).

¶ 46. Significant to this case, rules promulgated under Wis. Stat. § 281.15, which set forth water quality standards,[15] may not be reviewed under Wis. Stat. § 283.63.[16] § 283.63(5). Only "[t]he application of rules

---

[15] Wisconsin Stat. § 281.15(1) charges the DNR with promulgating rules setting water quality standards:

> The department shall promulgate rules setting standards of water quality to be applicable to the waters of the state, recognizing that different standards may be required for different waters or portions thereof. Water quality standards shall consist of the designated uses of the waters or portions thereof and the water quality criteria for those waters based upon the designated use. Water quality standards shall protect the public interest, which include the protection of the public health and welfare and the present and prospective future use of such waters for public and private water systems, propagation of fish and aquatic life and wildlife, domestic and recreational purposes and agricultural, commercial, industrial and other legitimate uses. In all cases where the potential uses of water are in conflict, water quality standards shall be interpreted to protect the general public interest.

The federal counterpart of § 281.15(1) is 33 U.S.C. § 1313(c)(2)(A).

As both the state and federal statutes make clear, water quality standards "have two primary components: designated 'uses' for a body of water (e.g., public water supply, recreation, agriculture) and a set of 'criteria' specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses." *Am. Paper Inst., Inc. v. U.S. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).

[16] In *Sewerage Commission of Milwaukee v. DNR*, 102 Wis. 2d 613, 627–28, 307 N.W.2d 189 (1981), this court deter-

promulgated under s. 281.15 may be reviewed" under § 283.63. *Id.*

¶ 47. Here, CWAC seeks review under Wis. Stat. § 283.63 of the permit reissued to Fort James' Broadway Mill. The scope of review under § 283.63 is the crux of this case.

## 2. CWAC's Petition for Review

¶ 48. In order to properly apply the facts of this case to the relevant statutory authority, it is necessary to have a basic understanding of the issues raised in CWAC's petition for review. CWAC's petition for review raised three issues based on federal law: (1) the reasonableness of the DNR's failure to prepare a reasonable potential analysis to determine whether the Fort James' Broadway Mill's increase in phosphorous discharge will cause or contribute to a violation of water quality standards under 40 C.F.R. § 122.44(d)(1); (2) the reasonableness of the permit's failure to state the effluent limitation for phosphorous as a maximum daily and average monthly discharge limitation and in terms of a mass limit, pursuant to 40 C.F.R. § 122.45(d) and (f); and (3) the reasonableness of the DNR's failure to perform a reasonable potential analysis to determine whether Fort James' Broadway Mill discharges mercury at a level that will cause or contribute to a violation of water quality standards under 40 C.F.R. § 122.44(d).[17] Thus, at its most basic level, CWAC's petition for review

mined that a challenge to the validity of a rule on which a permit is based was available under Wis. Stat. § 147.20 (1975–76), the predecessor to Wis. Stat. § 283.63. However, at that time, the equivalent to Wis. Stat. § 283.63(5) did not exist. The legislature created Wis. Stat. § 147.20(5), the predecessor to Wis. Stat. § 283.63(5), in 1987. *See* 1987 Wis. Act 60, § 15.

[17] In its response brief to this court, CWAC described its petition for review under Wis. Stat. § 283.63 as "alleg[ing] that

alleged that the permit reissued to Fort James' Broadway Mill fails to comply with 40 C.F.R. §§ 122.44(d) and 122.45(d) and (f). Accordingly, we briefly describe those two provisions.

¶ 49. 40 C.F.R. § 122.44(d) provides generally that each NPDES permit must include conditions that meet the requirements of water quality standards, "when applicable." Section 122.44(d) is applicable to the WPDES permit program via 40 C.F.R. § 123.25.

¶ 50. 40 C.F.R. § 122.45(d) provides that for continuous discharges, all permit effluent limitations, including those necessary to achieve water quality standards, shall be stated as maximum daily and average monthly discharge limitations, "unless impracticable." Section 122.45(f)(1) provides that all pollutants limited in permits shall have their limitations expressed in terms of mass, with certain exceptions. Again, section 122.45 is applicable to the WPDES permit program via 40 C.F.R. § 123.25.

¶ 51. CWAC acknowledges that the issues it raises implicate water quality standards and that the DNR's rules setting forth water quality standards may not be reviewed under Wis. Stat. § 283.63. *See* § 283.63(5). Accordingly, CWAC maintains that it is not seeking review of any rule promulgated by the DNR. Instead, CWAC argues, it is challenging the permit reissued to Fort James' Broadway Mill on the grounds that the permit fails to comply with 40 C.F.R. §§ 122.44 and

[the] DNR failed to follow state law requiring the agency to comply with applicable federal regulations requiring a reasonable potential analysis for phosphorous and mercury, and the inclusion of daily maximum and average monthly limits for phosphorous." CWAC then cited to 40 C.F.R. §§ 122.44(d)(1) and 122.45.

68

122.45—federal requirements which, according to CWAC, are imposed upon the permit via state statutes.

¶ 52. Specifically, CWAC points to Wis. Stat. § 283.31(3)(d)2. and argues that the statute's plain language requires all WPDES permits to comply with "any applicable federal law or regulation."[18] Therefore, CWAC asserts that the DNR was obligated to comply with 40 C.F.R. §§ 122.44 and 122.45 when establishing the terms of the permit reissued to Fort James' Broadway Mill. According to CWAC, it would be illogical for the legislature to require the DNR to issue permits that comply with federal law while at the same time precluding the DNR from reviewing a permit's compliance with federal law under Wis. Stat. § 283.63.

¶ 53. The DNR, on the other hand, argues that CWAC's position upsets the system of checks and balances created by the Clean Water Act. Because the EPA approved the WPDES permit program and therefore determined that Wisconsin's statutory and regulatory program is consistent with federal law, the DNR contends that a permit issued according to Wisconsin's statutory and regulatory program necessarily complies with federal law—unless and until the EPA determines otherwise. As the DNR points out, in this case, the EPA reviewed the proposed permit to determine whether it meets the federal guidelines and requirements, and the EPA did not object.

¶ 54. The DNR further contends that CWAC's interpretation of Wis. Stat. § 283.31(3)(d)2. renders meaningless the WPDES permit program. That is, according to the DNR, if § 283.31(3)(d)2. means simply that all state-issued permits must comply with any

---

[18] For the same general proposition, CWAC cites to Wis. Stat. §§ 283.001(2), 283.11(2), and 283.13(5).

federal law or regulation, then there would be no need for Wisconsin's own statutory and regulatory program; when issuing a permit, the DNR would have to look only to the Clean Water Act and the federal regulations promulgated thereunder.

¶ 55.  The DNR advances a very different interpretation of Wis. Stat. § 283.31(3)(d)2. First, the DNR looks to § 283.31(3)(a)-(d)1. and argues that those subsections require the DNR to issue permits that meet the following state requirements, whenever applicable: "[e]ffluent limitations"; "[s]tandards of performance for new sources"; "[e]ffluent standards, effluents prohibitions and pretreatment standards"; and "[a]ny more stringent limitations" necessary to meet state water quality standards.[19] Then, the DNR looks to § 283.31(3)(d)2. and argues that that particular subsection requires the DNR to issue permits that meet the requirements of "any applicable federal law or regulation" that the EPA has promulgated over a state rule—that is, a federal law or regulation that is "more stringent" than the limitations provided in § 283.31(3)(a)-(c).[20] The parties agree that no such overpromulgated federal laws or regulations are applicable in this case.

---

[19] *See* 33 U.S.C. § 1311(b)(1) (providing that every permit contain effluent limitations for point sources and "any more stringent limitation, including those necessary to meet water quality standards"); Wis. Stat. § 283.11(1) (charging the DNR with promulgating rules on effluent limitations, standards of performance for new sources, and effluent standards or prohibitions and pretreatment standards); Wis. Stat. § 281.15 (charging the DNR with promulgating rules setting water quality standards).

[20] *See, e.g.,* 40 C.F.R. § 132.6(f)-(j) (expressly applying certain federal requirements to the Great Lakes System in the State of Wisconsin).

¶ 56. As previously explained, the DNR's interpretation of Wis. Stat. § 283.31(3)(d)2. is entitled to great weight deference. *See supra* Part III. Accordingly, we will sustain the DNR's statutory interpretation as long as it is reasonable. *See Menasha Corp.*, 311 Wis. 2d 579, ¶ 48. We conclude that it is.

¶ 57. Importantly, the DNR's interpretation of Wis. Stat. § 283.31(3)(d)2. gives meaning to certain language that CWAC reads out of the statute: all WPDES permits must meet *"[a]ny more stringent limitations*, including those . . . [n]ecessary to comply with any applicable federal law or regulation." (Emphasis added.) If, as CWAC argues, § 283.31(3)(d)2. means simply that all WPDES permits must comply with "any applicable federal law or regulation," then the condition that such federal law or regulation provide a "more stringent limitation[]" would be meaningless. By the statute's plain language, the "applicable federal law or regulation" must provide for a "more stringent limitation[]" than something else. It is therefore reasonable to interpret the language of "[a]ny more stringent limitations" as referring back to the previous subsections; that is, pursuant to § 283.31(3)(d)2., all WPDES permits, whenever applicable, must meet more stringent limitations than the state requirements provided in § 283.31(3)(a)-(c), including those necessary to comply with any applicable federal law or regulation. The DNR interprets the "more stringent" language to mean any applicable federal law or regulation that the EPA has promulgated over a state rule. That interpretation is not unreasonable. We therefore sustain the DNR's interpretation of § 283.31(3)(d)2.

¶ 58. While our interpretation of Wis. Stat. § 283.31(3)(d)2. weakens CWAC's position, it does not resolve the central issue in this case. We must still

determine whether Wis. Stat. § 283.63 requires the DNR to hold a public hearing on CWAC's petition for review when the premise of CWAC's petition is that the permit fails to comply with 40 C.F.R. §§ 122.44(d) and 122.45(d) and (f). We conclude that Wis. Stat. § 283.63 does not require the DNR to hold a public hearing on a petition for review when the premise of the petition is that the permit fails to comply with basic requirements of the federal Clean Water Act and federal regulations promulgated thereunder.

¶ 59.  Requiring the DNR to hold a public hearing on CWAC's petition for review would undermine the careful federal and state balance created by the Clean Water Act. For purposes of this appeal, the parties do not dispute that the permit was properly reissued to Fort James' Broadway Mill under the state's statutory and regulatory authority. Indeed, CWAC is adamant that it is not challenging any rule promulgated by the DNR but instead is challenging the permit itself as being contrary to 40 C.F.R. §§ 122.44(d) and 122.45(d) and (f). However, we agree with the DNR that because the permit was properly reissued under the state's statutory and regulatory authority, then the permit necessarily complies with federal law—unless and until the EPA determines otherwise. This point is best demonstrated by considering the two federal regulations at issue in CWAC's petition for review: 40 C.F.R. §§ 122.44(d) and 122.45(d) and (f).

¶ 60.  When the EPA approved the WPDES permit program, the EPA deemed Wisconsin's statutory and regulatory authority adequate to issue permits that comply with the requirements of the Clean Water Act and of 40 C.F.R. pt. 123. See 33 U.S.C. § 1342(b)(1)(A), (2)(A); § 1342(c)(1); 40 C.F.R. § 123.61(b). 40 C.F.R. § 123.25 sets forth the permitting requirements that a

proposed permit program must meet. Significantly, both 40 C.F.R. §§ 122.44 and 122.45 are included among those permitting requirements. *See* 40 C.F.R. § 123.25(a)(15), (16). Thus, when the EPA approved the WPDES permit program, the EPA necessarily determined that the program complies with 40 C.F.R. §§ 122.44 and 122.45.

¶ 61. Similarly, any substantial revisions to the WPDES permit program have been, and will continue to be, subject to the EPA's approval. *See* 40 C.F.R. § 123.62(a). The EPA approves or disapproves the revisions based upon the requirements of the Clean Water Act and of 40 C.F.R. pt. 123—requirements which, again, include 40 C.F.R. §§ 122.44 and 122.45.

¶ 62. Finally, the EPA reviewed the permit reissuance to Fort James' Broadway Mill and did not object to the permit as drafted. Valid grounds for objection include when the proposed permit fails to comply with the requirements of the Clean Water Act or any regulations issued thereunder, or in particular, when the proposed permit fails to satisfy the requirements of 40 C.F.R § 122.44(d). *See* 40 C.F.R. § 123.44(c)(1), (5), (8). Thus, on the very grounds espoused by CWAC, the EPA itself did not object to the permit reissued to Fort James' Broadway Mill. Indeed, before the permit was reissued, the EPA was apprised of CWAC's allegations that the proposed permit failed to comply with federal law. As previously mentioned, the EPA requested and received copies from the DNR of any significant comments the DNR received during the public notice period.

¶ 63. Stated otherwise, by approving the WPDES permit program and by failing to object to the permit, the EPA effectively determined that the permit complies with 40 C.F.R. §§ 122.44(d) and 122.45(d) and (f).

73

In spite of the EPA's determination, CWAC asks this court to construe Wis. Stat. § 283.63 as requiring the DNR to subsequently determine whether the permit complies with those same federal regulations. We decline to do so. To adopt CWAC's interpretation of Wis. Stat. § 283.63 would be to empower the DNR to undercut the EPA's determination. Given the careful system of checks and balances envisioned by the Clean Water Act, the legislature could not have intended for the DNR to have the final say on a permit's compliance with federal law.[21]

¶ 64.  Furthermore, requiring the DNR to hold a public hearing on CWAC's petition for review would

---

[21] We do not question that administrative agencies and state courts are competent to interpret and apply federal law. *Froebel v. Meyer*, 217 F.3d 928, 935–37 (7th Cir. 2000) (concluding that the plaintiff was required to first raise in state court his claim that the DNR violated the Clean Water Act by discharging a pollutant without a permit); *Am. Paper Inst., Inc. v. U.S. EPA*, 890 F.2d 869, 875 (7th Cir. 1989) ("The state courts are perfectly competent to decide questions of federal law."); *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 558–59, 525 N.W.2d 723 (1995) (concluding that the plaintiff's federal constitutional claims were barred by claim preclusion because they were not raised before the Tax Appeals Commission); *Hogan v. Musolf*, 163 Wis. 2d 1, 21–22, 471 N.W.2d 216 (1991) ("Where the United States Supreme Court has held that another state's taxing scheme, which is substantially similar to Wisconsin's, violates federal law or the constitution, we conclude that the Department [of Revenue] and the [Tax Appeals] Commission have the authority to determine whether the continued application of the Wisconsin taxing scheme also violates federal law or the constitution.").

However, the fact that administrative agencies and state courts are competent to interpret and apply federal law does not resolve the issue presented in this case: whether Wis. Stat. § 283.63 requires the DNR to hold a public hearing on a petition for review when the premise of the petition is that the permit fails to comply with basic requirements of the Clean Water Act and federal regulations promulgated thereunder.

74

thwart the finality of permits properly issued under the WPDES permit program. When the DNR properly issues a permit under the state's statutory and regulatory authority, the permittee should be able to rely on the validity of the permit's terms and conditions. In other words, when there is no dispute that a permit's terms and conditions comply with state statutes and regulations, and when the permittee acts in accordance with those terms and conditions, the permittee is entitled to assurance that it is complying with the Clean Water Act. Indeed, Congress expressed that very point in 33 U.S.C. § 1342(k). Section 1342(k) expressly provides that compliance with a permit issued under § 1342 is deemed compliance with the Clean Water Act. Likewise, "compliance with a state-administered permit is deemed compliance with the [Clean Water Act]." *U.S. Dep't of Energy*, 503 U.S. at 634 (citing § 1342(k)) (White, J., concurring in part, dissenting in part). As recognized by the United States Supreme Court, the purpose of § 1342(k) is to give permits finality. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977) ("The purpose of § 402(k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict. In short, § 402(k) serves the purpose of giving permits finality."). In this case, there is no dispute that the permit was properly issued under the WPDES permit program, and CWAC does not question Fort James' Broadway Mill's compliance with the permit's terms and conditions. Given these circumstances, if we were to construe Wis. Stat. § 283.63 as requiring the DNR to determine whether the permit complies with the Clean Water Act,

we would thwart the finality of the permit that Fort James' Broadway Mill is entitled to rely on under 33 U.S.C. § 1342(k).

¶ 65. Our holding does not leave CWAC without an avenue of relief. We merely foreclose Wis. Stat. § 283.63 as one avenue. If CWAC is entitled to a remedy, the remedy rests with the EPA. For instance, an aggrieved person may seek limited judicial review in federal district court of the EPA's decision not to object to a permit. *See Save the Bay*, 556 F.2d at 1295–96. While such judicial review is available on only two narrow grounds, one of those grounds is particularly relevant to this case: an aggrieved person may claim in federal district court that a proposed permit violates applicable federal guidelines that the EPA failed to consider.[22] *See id.* at 1296. In addition, any interested person may seek judicial review in the federal courts of appeals of the EPA's action "in making any determination as to a State permit program . . . ." 33 U.S.C. § 1369(b)(1)(D);[23] *see also Am. Forest & Paper Ass'n v.*

[22] The second ground for relief is a claim that unlawful factors tainted the EPA's decision not to object to the permit. *Save the Bay, Inc. v. Adm'r of the EPA*, 556 F.2d 1282, 1286, 1296 (5th Cir. 1977).

[23] Federal courts of appeals have agreed that their original jurisdiction under 33 U.S.C. § 1369(b)(1) does not cover review of the EPA's discretionary determination to object or not to object to a state-issued permit. *See, e.g., Am. Paper Inst.*, 890 F.2d at 874–75 (concluding that § 1369(b)(1)(F) does not provide federal courts of appeals with the power to review the EPA's objections to state-issued permits); *Save the Bay*, 556 F.2d at 1291–92 (concluding that the federal courts of appeals' jurisdiction under § 1369(b)(1)(F) does not encompass review of the EPA's action in failing to object to a state-issued permit).

*U.S. EPA*, 137 F.3d 291, 295 (5th Cir. 1998). For example, an interested person may seek review of the EPA's decision to withdraw or not to withdraw authorization of a state's permit program. *Sierra Club v. U.S. EPA*, 377 F. Supp. 2d 1205, 1208 (N.D. Fla. 2005). As previously explained, one of the circumstances in which the EPA may withdraw its approval of a state's permit program is when the state issues permits that do not comply with the federal regulations. *See* 40 C.F.R. § 123.63(a)(2).

## V. CONCLUSION

¶ 66.   We conclude that Wis. Stat. § 283.63 does not require the DNR to hold a public hearing on CWAC's petition for review of the permit reissued to Fort James' Broadway Mill when the premise of CWAC's petition is that the permit fails to comply with basic requirements of the federal Clean Water Act and federal regulations promulgated thereunder. A conclusion otherwise would undermine the careful federal and state balance created by the Clean Water Act and would thwart the finality of permits properly issued under the WPDES permit program. If CWAC is entitled to a remedy, the remedy rests with the EPA.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 67. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with the court of appeals and would affirm its decision.

As explained above, the aggrieved person may instead seek limited judicial review in federal district court. *See Save the Bay*, 556 F.2d at 1295–96.

¶ 68. The ultimate issue presented is whether the DNR is authorized to determine whether, on challenge, terms of a state-issued wastewater discharge permit comply with federal law.

¶ 69. The majority opinion defers to the DNR, agreeing that the petitioners' remedy for a violation of federal law rests with the federal Environmental Protection Agency.[1] I agree with the court of appeals that the DNR has authority to determine whether a state-issued permit complies with federal law.

¶ 70. The majority opinion errs in two fundamental ways: First, the majority misinterprets the balance created between federal oversight and state application and enforcement of the Clean Water Act. Second, by inverting the federal/state balance, the majority has left the petitioners in the present case, as well as future challengers, with no effective forum in which to express their concerns that terms in a state-issued permit do not comply with federal law.

\* \* \* \*

¶ 71. The Clean Water Act establishes a partnership between the federal government and the states to eliminate water pollution across the country. *Save the Bay, Inc. v. Adm'r of EPA*, 556 F.2d 1282, 1284 (5th Cir. 1977). The partnership promotes a delicate balance

---

[1] Contrary to the majority opinion, I conclude that the DNR's statutory interpretation is not entitled to any deference. The instant case does not present a decision on the applicability or administration of a highly technical statute regulating water pollution. Instead the instant case presents a question of the DNR's scope of authority. Furthermore, the DNR does not have a long or consistent interpretation of Wis. Stat. §§ 283.31(3)(d)2. and 283.63 relating to the facts of the instant case.

between the federal government and state governments in administering the Clean Water Act.[2] The majority opinion inverts this balance between federal and state regulation, thereby effectively eliminating the petitioners' access to a review of the terms of the permit.

¶ 72.  The balance under the Clean Water Act is clear: Congress intended the states to play the lead role in administering water pollution control laws.[3]

¶ 73.  The Clean Water Act delegates to the states the authority to issue permits. 33 U.S.C. § 1342(b). Wisconsin's permit program was authorized by the federal government in 1974, and the Wisconsin Department of Natural Resources (DNR) has been administering the permit program since that time.[4] To obtain

---

[2] The federal fifth circuit court of appeals described the partnership and balance in the oft-cited *Save the Bay, Inc. v. Administrator of EPA*, 556 F.2d 1282, 1296–97 (5th Cir. 1977), as follows:

> We have been called upon to examine a statutory scheme that has the potential for the optimum of federalism. . . . The success of their federalist venture will depend not only upon the grace, but also the substance of movement by both partners in the ballet. We have endeavored to ink a most self-effacing role for the federal judiciary, one which should foster a harmonious background to the dance and necessitate intervention only when a point of unmelodious discord seriously threatens the contrapuntal balance.

[3] *Save the Bay, Inc. v. Adm'r of EPA*, 556 F.2d 1282 (5th Cir. 1977); *District of Columbia v. Schramm*, 631 F.2d 854 (D.C. Cir. 1980).

[4] States applying for authority must show that their permitting programs will be at least as stringent as the federal permitting program. 33 U.S.C. § 1342(b)(1)(A) (state permit programs must show that they "insure compliance with" all provisions of the Clean Water Act). Once a state has illustrated that its permit program will comply with the requirements of the Clean Water Act, it is authorized to issue and enforce its own permits for water pollution.

approval for its permit program, Wisconsin had to show that its permit program ensures compliance with the requirements of the Clean Water Act. 33 U.S.C. § 1342(b)(1)(A). The Wisconsin statutes also require that the permit program comply with the Clean Water Act whenever applicable. Wis. Stat. § 283.31(3)(d)2.

¶ 74. After the Environmental Protection Agency approves a State's plan, the State takes the primary role in issuing permits and administering and enforcing the laws.[5] "[The] legislative history, more explicit and unequivocal than generally found, leans in almost every expression toward a minimal federal intervention when a state plan has been approved."[6]

¶ 75. The State must provide the Environmental Protection Agency with notice of all proposed permits. Wis. Stat. § 243.41(1). It did in this case. The federal Environmental Protection Agency retains the authority to object to state-issued permits that it finds fall outside the requirements of the Clean Water Act. 33 U.S.C. § 1342(d)(2); *see also Save the Bay*, 556 F.2d at 1294. The Environmental Protection Agency's oversight and review of Wisconsin-issued permits is, however, wholly discretionary.

---

[5] The delegation of power to the State of Wisconsin is explicit: "The program that you conduct pursuant to this authority must at all times be in accordance with Section 402 of the Act, all guidelines promulgated pursuant to Section 304(h)(2) of the Act, and the Memorandum of Agreement between the Regional Administrator of EPA's Region V and the Administrator of the Division of Environmental Protection, Wisconsin Department of Natural Resources . . . ." Letter from Russell E. Train, U.S. E.P.A., to Governor Patrick J. Lucey, dated Feb. 4, 1974, granting authority to conduct a State Permit Program.

[6] *Save the Bay*, 556 F.2d at 1294.

¶ 76. The Environmental Protection Agency is not required to but may, in its discretion, enforce state compliance with federal requirements by objecting to state-issued permits. Thus the EPA may decide that a state-issued permit is not in compliance with federal law but nevertheless does not warrant an objection. As the Wisconsin court of appeals explained, the legislative history shows that the Clean Water Act envisioned that the Environmental Protection Agency would not veto every permit out of compliance with federal law and would use what power it had over state-issued permits "judiciously."[7]

¶ 77. That the Environmental Protection Agency did not object to the permit in the instant case is not, as the majority opinion asserts at ¶ 63, an "effective determination" that the permit complies with federal law. The Environmental Protection Agency's failure to object means only that the Environmental Protection Agency decided not to object.

¶ 78. The majority opinion attempts to pass off judicial review of the state-issued permit to the federal courts. Majority op., ¶ 65 ("If CWAC is entitled to a remedy, the remedy rests with the EPA."). The federal courts are not, however, willing to receive the pass.

¶ 79. In fact, the federal courts of appeals, including the Seventh Circuit court of appeals, have made it clear that they are ineligible receivers. If the Environmental Protection Agency does not exercise its discretion to review the state permit, the federal courts will not act. "Congress spread across the record clear and convincing evidence of legislative intent to preclude

_____

[7] *Andersen v. DNR*, 2010 WI App 64, ¶ 27, 324 Wis. 2d 828, 783 N.W.2d 877.

federal review of state-issued permits." *Am. Paper Inst. Inc. v. U.S. EPA*, 890 F.2d 869, 875 (7th Cir. 1989).

¶ 80.   I conclude that petitioning the Environmental Protection Agency for review of a permit's terms does not represent a significant avenue in which to review compliance with federal law. The Environmental Protection Agency's discretionary decision not to object to permit terms cannot effectively be challenged in federal court.[8]

¶ 81.   Meaningful federal judicial review is not available and the majority opinion eliminates the opportunity for meaningful review in state courts to determine whether the terms of a DNR-issued water pollution permit comport with federal law. The majority reads the statutes to mean that once the state has issued a permit and the Environmental Protection Agency has chosen not to veto that permit, further state review of challenges based on federal law would be superfluous.

¶ 82.   The majority opinion inverts the balance created between the state's application and enforcement of permitting and federal oversight, leaving the petitioners in the present case, as well as future petitioners, with no forum in which to meaningfully express their concerns that a state permit does not comply with federal law.

¶ 83.   Under the Clean Water Act, the states have significant authority to monitor their own programs to assure compliance with state and federal laws. This level of state autonomy to issue permits, with judicious federal oversight, necessitates the ability of interested parties to ensure compliance with both state *and federal* water pollution control regulations within the State permitting process.

_____

[8] *District of Columbia v. Schramm*, 631 F.2d 854 (D.C. Cir. 1980).

¶ 84. Nonetheless, the majority opinion accepts the DNR's position that the DNR does not have authority to review permit terms' compliance with federal law. The law is clear, however, that state courts and state administrative agencies may interpret and apply federal laws, and the legislature has directed that permits issued comply with federal law.[9] Wis. Stat. §§ 283.31(3)(d)2., 283.63.

¶ 85. As a result of the majority opinion, the petitioners in the instant case have no effective remedy. Parties affected by a permit in violation of federal law cannot hold the DNR accountable through the administrative review process and judicial review in state courts. The underlying theme of the majority opinion is to restrict meaningful review of state-issued permits. Wis. Stat. §§ 283.31(3)(d)2., 283.63. The majority opinion denies meaningful review in the name of finality for permit holders. Majority op., ¶ 64.

¶ 86. Restricting review of permits issued in Wisconsin affects permit holders, businesses, other government entities, and concerned citizens alike. These interested parties must be afforded some avenue to challenge permits that are issued in violation of federal law. The majority opinion does not agree, and instead

---

[9] *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 525 N.W.2d 723 (1995) (holding federal claims were precluded because they should have been raised during state administrative proceedings); *Hogan v. Musolf*, 163 Wis. 2d 1, 471 N.W.2d 216 (1991) (Department of Revenue and Tax Appeals Commission have authority to determine whether state tax laws violate federal laws); *Froebel v. Meyer*, 217 F.3d 928 (7th Cir. 2000) (federal Clean Water Act claim should have been brought in state administrative and court tribunals, not federal courts); *Am. Paper Inst. Inc. v. U.S. EPA*, 890 F.2d 869, 875 (7th Cir. 1989) (state courts are competent to decide questions of federal law).

leaves the petitioners in the present case, and all future challengers of Wisconsin-issued water pollution permits, without a forum to bring an effective challenge that the terms of a permit are unreasonable based on a violation of federal law.

¶ 87.   Because the majority inverts the federal-state partnership and the balance set forth in the Clean Water Act and effectively eliminates a meaningful forum for the petitioners, I dissent. I would instead hold that the DNR has the authority to determine whether permit conditions it established comply with federal law, and that the DNR should provide the petitioners with a public hearing on the permit in question.

¶ 88.   Because I agree with the decision of the court of appeals, I dissent.

¶ 89.   I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.