# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP1688 |

| | |
|---|---|
| COMPLETE TITLE: | Clean Wisconsin, Inc., Lynda Cochart, Amy Cochart, Roger DeJardin, Sandra Winnemueller and Chad Cochart,<br>       Petitioners-Respondents,<br>   v.<br>Wisconsin Department of Natural Resources,<br>       Respondent-Appellant,<br>Kinnard Farms, Inc.,<br>       Intervenor-Co-Appellant,<br>Wisconsin Legislature,<br>       Intervenor. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 8, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 12, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | John W. Markson |

JUSTICES:

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, and DALLET, JJ., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

NOT PARTICIPATING:

HAGGEDORN, J., did not participate.

ATTORNEYS:

    For the intervenor-co-appellant, there were briefs filed by *Jordan J. Hemaidan, Nancy Cruz,* and *Michael Best & Friedrich LLP*, Madison. There was an oral argument by *Jordan J. Hemaidan*.

    For the intervenor, there were briefs filed by *Eric M. McLeod, Kirsten A. Atanasoff, Lisa M Lawless*, and *Husch*

*Blackwell LLP*, Madison and Milwaukee. There was an oral argument by *Eric M. McLeod*.

For the petitioners-respondents, there was a brief filed by *Andrea Gelatt, Rob Lee*, and *Midwest Environmental Advocates*, Madison; with whom on the brief was *Evan Feinauer* and *Clean Wisconsin, Inc.*, Madison. There was an oral argument by *Andrea Gelatt*.

For the respondent-appellant, there was a brief filed by *Jennifer L. Vandermeuse* and *Gabe Johnson-Karp* assistant attorneys general; with whom on the brief was *Joshua L. Kaul*, attorney general, Madison. There was an oral argument by *Jennifer L. Vandermeuse*.

An amicus curiae brief was filed by *Ryan J. Owens*, Verona.

An amicus curiae brief was filed on behalf of Wisconsin Environmental Health Network by *John S. Greene*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers and Commerce, Midwest Food Products Association, Wisconsin Cheese Makers Association, Dairy Business Association, Wisconsin Potato and Vegetable Growers Association, Wisconsin Farm Bureau Federation, Wisconsin Paper Council, Wisconsin Corn Growers Association, Wisconsin Dairy Alliance, and Venture Dairy Cooperative by *Robert I. Fassbender* and *Great Lakes Legal Foundation*, Madison; with whom on the brief was *Luca T. Vebber, Corydon J. Fish,* and *Wisconsin Manufacturers & Commerce*, Madison.

An amicus curiae brief was filed on behalf of Food & Water Watch, Family Farm Defenders, and Sustain Rural Wisconsin Network by *Zach Corrigan*, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP1688
(L.C. No. 2015CV2633)

STATE OF WISCONSIN        :      IN SUPREME COURT

Clean Wisconsin, Inc., Lynda Cochart, Amy Cochart, Roger DeJardin, Sandra Winnemueller and Chad Cochart,

        Petitioners-Respondents,

  v.

Wisconsin Department of Natural Resources,

        Respondent-Appellant,

Kinnard Farms, Inc.,

        Intervenor-Co-Appellant,

Wisconsin Legislature,

        Intervenor.

**FILED**

**JUL 8, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, and DALLET, JJ., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. ROGGENSACK, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

HAGEDORN, J., did not participate.

---

APPEAL from an order of the Circuit Court for Dane County, John W. Markson, Judge. *Affirmed.*

¶1    JILL J. KAROFSKY, J.    This case is about whether the Wisconsin Department of Natural Resources (DNR) had the explicit authority to impose an animal unit maximum condition and an off-site groundwater monitoring condition upon a Wisconsin Pollutant Discharge Elimination System (WPDES) permit it reissued to Kinnard Farms, Inc. (Kinnard) for its concentrated animal feeding operation (CAFO).  The circuit court decided that the DNR had the explicit authority to do so, and the court of appeals certified this appeal to us, pursuant to Wis. Stat. § (Rule) 809.61 (2017-18).[1]

¶2    We conclude that the DNR had the explicit authority to impose both the animal unit maximum and off-site groundwater monitoring conditions upon Kinnard's reissued WPDES permit pursuant to Wis. Stat. § 283.31(3)-(5) and related regulations. Accordingly, we affirm the order of the circuit court.

I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶3    Kinnard operates a large CAFO[2] in the Town of Lincoln. In 2012, Kinnard wanted to expand its dairy operation by

---

[1] The Honorable John W. Markson of the Dane County Circuit Court presided.

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[2] See Wis. Admin. Code § NR 243.03(12)(a)(defining a CAFO, as relevant here, as "an animal feeding operation [with] . . . 1,000 animal units or more at any time [that] stores manure or process wastewater in a below or at grade level storage structure or land applies manure or process wastewater").

2

building a second site and adding 3,000 dairy cows. The expansion required Kinnard to apply to the DNR for reissuance of its WPDES permit to include both the original site and the proposed expansion.[3] Wis. Stat. § 283.59(1). The DNR approved Kinnard's application and reissued Kinnard's WPDES permit with effective dates of September 1, 2012-August 31, 2017.[4]

¶4 The five named petitioners in this appeal sought review of the reissued WPDES permit because they lived near Kinnard's CAFO, had private drinking wells, and were concerned that Kinnard's proposed expansion would exacerbate current groundwater contamination issues. The petitioners alleged that the reissued WPDES permit was inadequate because, among other failings, it did not set a "maximum number of animal units" or "require monitoring to evaluate impacts to groundwater." Accordingly, they petitioned for a contested case hearing to review the DNR's decision, pursuant to Wis. Stat. § 283.63(1).

¶5 The DNR granted the petition and referred the matter to an administrative law judge (ALJ), pursuant to Wis. Stat. §§ 227.43(1)(b), 283.63. Kinnard filed for summary judgment, alleging that the DNR lacked statutory authority to impose an

---

[3] The second site, a quarter-mile away from the original facility, is also a CAFO, and therefore a "point source" subject to the WPDES permit program, as outlined in ch. 283. All owners and operators of point sources in Wisconsin must obtain a WPDES permit in order to discharge pollutants into the waters of the State. Wis. Stat. §§ 283.31(1), 283.37.

[4] See Wis. Stat. § 283.53(1)(establishing a 5-year maximum term for WPDES permits).

3

animal unit maximum, citing 2011 Wis. Act 21, specifically Wis. Stat. § 227.10(2m).[5] The ALJ denied the motion, concluding there were genuine issues of material fact, and set the matter for an evidentiary hearing.

¶6 The ALJ conducted a four-day evidentiary hearing during which Town of Lincoln community members who lived and worked near Kinnard's CAFO testified about the contamination of their well water and the impact of that contamination on their businesses, homes, and daily lives. The community members conveyed their belief that Kinnard's CAFO was the source of the well water contamination. The ALJ also heard testimony from a number of experts who established that up to 50 percent of private wells in the Town of Lincoln were contaminated and that 30 percent of wells tested positive for E. coli bacteria.[6] Additionally, an expert testified about the particular features of the land underlying Kinnard's CAFO which made that land extremely susceptible to groundwater contamination. According

---

[5] The only provision of 2011 Wis. Act 21 at issue in this case is Wis. Stat. § 227.10(2m).

[6] As the ALJ noted, "No witness for the dairy or the DNR disputed these numbers."

"The presence of large volumes of feces in and around animals in CAFO[s] provides a breeding ground for many bacteria," including E. coli. The bacteria can cause disease outbreaks through "contact with these organisms via swimming, eating shellfish, eating contaminated food, or drinking contaminated water." United States Environmental Protection Agency, Risk Assessment Evaluation for Concentrated Animal Feed Operations, 1, 29-30 (May 2004).

to the testimony, pollution could travel over half a mile through groundwater into wells in 24 hours.[7]

¶7 Based on the evidence presented, the ALJ concluded that the "level of groundwater contamination including E. coli bacteria in the area at or near the [second] site is [] very unusual." Additionally, the ALJ identified "what could fairly be called a groundwater contamination crisis in areas near the site." The ALJ further found that "[t]he proliferation of contaminated wells represents a massive regulatory failure to protect groundwater in the Town of Lincoln." Of import to this appeal, the ALJ determined that, based on the facts presented, the DNR had "clear regulatory authority" to impose the two conditions disputed in this action upon Kinnard's reissued WPDES permit.

---

[7] The groundwater beneath Kinnard's CAFO is in a featured carbonated bedrock aquifer; this type of bedrock is referred to as "karst." The Iowa Department of Natural Resources explains karst geology as such:

> Karst bedrock is characterized as bedrock that is close to the land's surface and contains a vast network of underground drainage systems that have direct connections to the land's surface. In areas of Karst . . . [s]ome of the water that originates at the surface──possibly near sources of contamination──flows undetected into the ground. This water can contain contaminants that are found on the land's surface and those not bound or utilized by the area[']s soils and land cover. Once in the ground, this water that was once on the surface becomes part of the groundwater supply.

iowadnr.gov/environmental-protection/water-quality/private-well-program/private-well-testing/contamination-in-karst

¶8 The first condition was an animal unit maximum. The ALJ ordered the DNR to modify Kinnard's reissued WPDES permit to "articulate the maximum number of animal units allowed at the facility." The ALJ reasoned that "[e]stablishing a cap on the maximum number of animal units will provide clarity and transparency for all sides as to the limits that are necessary to protect groundwater and surface waters." Additionally, the ALJ noted that the condition would assure compliance with the statutory requirement that CAFOs have and maintain 180 days' worth of properly designed manure storage.[8] This was especially important due to Kinnard's recent history of noncompliance with this storage requirement. The ALJ also reasoned that "[i]t is not a question of either/or——the 180 day storage requirement represents a good short term measure to detect an impending problem, but the maximum animal unit number represents a useful longer-term management tool."

¶9 The second condition was off-site groundwater monitoring. The ALJ determined that "a groundwater monitoring plan is essential given that the area is 'susceptible to groundwater contamination' within the meaning of Wis. Admin. Code § NR 243.15(3)(2)(a)." According to the ALJ, "it is essential that the [DNR] utilize its clear regulatory

---

[8] Pursuant to Wis. Admin. Code § NR 243.15(3)(i-k)(March 2019), CAFOs must have and maintain 180 days' worth of properly designed manure storage to ensure sufficient storage capacity during the winter months when spreading of manure is limited to emergencies. See § NR 243.14(7)(a).

6

authority . . . to ensure that Kinnard Farms meet its legal obligation under Wis. Admin. Code § NR 243.14(2)(b)(3)[9] not to contaminate well water with fecal bacteria from manure or [from] process wastewater." The ALJ ordered the DNR to modify the permit "to include a groundwater monitoring plan which includes no less than six monitoring wells. If practicable, the permit-holder shall include at least two monitoring wells which are located off-site on voluntarily willing neighboring properties with water contamination issues or risks." The ALJ justified the off-site monitoring as "better and more likely to yield results that identified problem areas" and acknowledged that "[o]bviously, this would require the voluntary participation of off-site property owners."[10]

¶10 Kinnard appealed the ALJ's decision to the DNR Secretary, pursuant to Wis. Admin. Code § NR 2.20(1) (February 2019).[11] The DNR Secretary denied review, reasoning that the issue "would most appropriately [be] decided by the courts of this state." Kinnard then filed a petition for judicial review

---

[9] This and all subsequent references to the Wis. Admin. Code ch. NR 243 are to the March 2019 register date unless otherwise indicated.

[10] The DNR's authority to require on-site groundwater monitoring is not at issue in this case, as Wis. Admin. Code § NR 243.15(3)(c)2.a. fully supports the "on-site" groundwater monitoring that the ALJ imposed in its decision.

[11] All subsequent references to the Wis. Admin. Code ch. NR 2 are to the February 2019 register date unless otherwise indicated.

in the Kewaunee County Circuit Court. The circuit court determined that the petition for judicial review was premature and was not "final" for purposes of appeal until the DNR imposed the conditions ordered by the ALJ.

¶11 At this point, the DNR began implementing the two conditions. Shortly thereafter, in August 2015, the DNR sought review from the Wisconsin Department of Justice (DOJ) regarding its ability to impose the conditions upon Kinnard's reissued WPDES permit in light of Wis. Stat. § 227.10(2m). DOJ opined that § 227.10(2m) precluded the DNR from imposing the conditions, which prompted the DNR Secretary to reconsider her decision denying review of the ALJ's decision. The DNR Secretary concluded that such a review was appropriate and quickly issued an order reversing the portion of the ALJ's decision that imposed the animal unit maximum and off-site groundwater monitoring conditions.

¶12 The five named petitioners filed a petition for judicial review in the Kewaunee County Circuit Court, and Clean Wisconsin filed a petition for judicial review in the Dane County Circuit Court. The Dane County Circuit Court consolidated the two cases and reversed the DNR Secretary's decision, concluding that the DNR had the explicit authority to impose the animal unit maximum and off-site groundwater monitoring conditions on Kinnard's reissued WPDES permit

pursuant to Wis. Stat. § 283.31(3)-(5) and related regulations.[12] The circuit court remanded the case with instructions for the DNR to implement the ALJ's order as to those conditions.

¶13 The DNR and Kinnard appealed the circuit court's decision.[13] The court of appeals certified the case to this court and we accepted certification in April 2019.[14] Shortly thereafter, we granted the DNR's motion to modify the briefing schedule since it was no longer advocating the same positions as

_____

[12] At the outset, the circuit court determined that the ALJ's decision became a final decision of the DNR when the DNR Secretary denied Kinnard's petition for review and the DNR did not petition for review itself under Wis. Admin. Code § NR 2.20, pursuant to §§ NR 2.155(1), 2.20(3). Additionally, the circuit court concluded that the DNR Secretary's attempt to reverse her denial of Kinnard's petition was untimely and exceeded her authority.

[13] The circuit court granted the petitioners their fees and costs under Wis. Stat. § 814.245. The DNR appealed that judgment and moved the court of appeals to consolidate the two appeals, which it did. The DNR voluntarily dismissed the appeal regarding fees and costs, Case No. 2016AP2502, in May 2019, so the issue is no longer before the court.

[14] While the appeals were pending, Kinnard's 2012 permit expired and the DNR issued a subsequent permit that did not contain either an animal unit maximum or an off-site groundwater monitoring condition. A group of citizens petitioned for a contested case hearing regarding the new permit, but the parties agreed to put that dispute on hold until the resolution of this appeal.

The court of appeals also certified another consolidated "companion" case, Clean Wisconsin, Inc. v. DNR, No. 2018AP59. Although both cases address the effect of Wis. Stat. § 227.10(2m) on the scope of the DNR's authority, each deals with a different authorizing statute, thus presenting different legal issues. See Clean Wis., Inc. v. DNR, No. 2018AP59, slip op. (Wis. S. Ct. July 8, 2021).

it did in the circuit court. The Joint Committee on Legislative Organization (the Legislature) also moved the court to intervene. We granted that motion in January 2021.[15]

## II. STANDARD OF REVIEW

¶14 "When an appeal is taken from a circuit court order reviewing an agency decision, we review the decision of the agency, not the circuit court." Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, ¶15, 293 Wis. 2d 1, 717 N.W.2d 166. We review questions of agency authority de novo. Andersen v. DNR, 2011 WI 19, ¶¶25-26, 332 Wis. 2d 41, 796 N.W.2d 1.

¶15 This case also requires us to interpret several statutory provisions, which we review de novo. Noffke ex rel. Swenson v. Bakke, 2009 WI 10, ¶9, 315 Wis. 2d 350, 760 N.W.2d 156. The purpose of statutory interpretation is to "determine what the statute means so that it may be given its full, proper, and intended effect." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.

## III. ANALYSIS

¶16 We are tasked with determining whether Wis. Stat. § 283.31(3)-(5), and related regulations, grant the DNR explicit authority to impose the two conditions at issue upon Kinnard's

---

[15] Although the caption of this case is Clean Wisconsin v. DNR, that is a misnomer. Clean Wisconsin and the DNR are now aligned in view, and the Legislature and Kinnard are likewise aligned.

reissued WPDES permit. We first provide some background regarding the WPDES permit program and its significance as it relates to: (1) CAFOs; (2) restricting the amount of pollutants discharged into waters of the state ("effluent limitations"[16]); and (3) groundwater protection standards. We then interpret the "explicit authority" requirement of Wis. Stat. § 227.10(2m). Next, we examine the text of § 283.31(3)-(4), paying special attention to the terms "effluent limitations" and "groundwater protection standards." We conclude by determining whether § 283.31(3)-(5), and relevant regulations, explicitly authorized the DNR to impose both the animal unit maximum and off-site groundwater monitoring conditions upon Kinnard's reissued WPDES permit.

A. Relevant Background

¶17 We begin with a discussion of the WPDES permit program and its impact on CAFOs, effluent limitations, and groundwater protection standards to provide context for our statutory analysis. The WPDES permit program is outlined in ch. 283 of the Wisconsin Statutes, wherein the DNR is granted "all authority necessary to establish, administer and maintain a state pollutant discharge elimination system" in order to protect the "waters of this state," including groundwater and

---

[16] Wisconsin Stat. § 283.01(6) defines an "effluent limitation" as "any restriction established by [DNR] . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into waters of this state."

surface water, from pollution.  Wis. Stat. § 283.001(1)-(2).[17] Chapter 283 prohibits the discharge of any pollutant into the waters of the state unless the DNR authorizes the discharge in a permit.  Wis. Stat. § 283.31(1); 283.37.  The DNR may issue a WPDES permit "for the discharge of any pollutant, or combination of pollutants . . . upon condition that such discharges will meet" the requirements outlined in § 283.31(3).  Additionally, § 283.31(4) mandates that the DNR prescribe "additional conditions" necessary to "assure compliance" with the requirements listed in § 283.31(3).

¶18  CAFOs are statutorily required to apply to the DNR for a WPDES permit because they are "point sources" as defined in Wis. Stat. § 283.01(12).  Generally speaking, a CAFO is "a specific type of large-scale industrial agricultural facility that raises animals, usually at high-density, for the [production] of meat, eggs, or milk."  National Association of Local Boards of Health, Understanding Concentrated Animal Feeding Operations and Their Impact on Communities (2010).  Due to their size, CAFOs produce as much manure——waste——as do small and medium-size cities.  For example, "[a] farm with 2,500 dairy cattle is similar in waste load to a city of 411,000 people."

---

[17] The United States Environmental Protection Agency (EPA) is authorized to allow States to administer their own permit programs, in lieu of the National Pollution Discharge Elimination System, so long as those States meet certain federal requirements.  33 U.S.C. § 1342(b)-(c) (2019).  The EPA approved the WPDES permit program in 1974.  Andersen v. DNR, 2011 WI 19, ¶37, 332 Wis. 2d 41, 796 N.W.2d 1.

United States Environmental Protection Agency, <u>Risk Assessment Evaluation for Concentrated Animal Feed Operations</u>, 7 (May 2004).

¶19 CAFOs' agricultural waste, including manure and water that comes into contact with animal feed and manure (also referred to as "process wastewater"[18]), is defined as a "pollutant" and subject to regulation. Wis. Stat. § 283.01(13). WPDES permits establish effluent limitations, which are restrictions on the amount of pollutants a point source like a CAFO may release into the waters of the state. This includes discharges both from the production area (on-site) and onto the fields where manure is land-applied (off-site).[19] "Because large numbers of animals are confined in relatively small areas at CAFOs, a very large volume of manure is produced and must be kept in a correspondingly small area until disposed of." United States Environmental Protection Agency, <u>supra</u> at 1. While manure is useful to the farming industry as fertilizer, in large quantities it has the potential to become hazardous because

---

[18] <u>See</u> Wis. Admin. Code § NR 243.03(53) (defining "process wastewater" as "wastewater from the production area directly or indirectly used in the operation of animal feeding operation that results from," among other things, "[w]ater that comes into contact with any raw materials or animal byproducts including manure [or] feed").

[19] Wisconsin Admin. Code § NR 243.03(54) defines the "production area," in part, as "that part of an animal feeding operation that includes the animal confinement area, the manure storage area, the raw materials storage area, and the waste containment areas but not CAFO outdoor vegetated areas."

"[t]raditional means of using manure are not adequate to contend with the large volumes present at CAFOs." Id. at 2.

¶20 Long-term manure storage requirements are common in states like Wisconsin where long, cold winters prevent liquid manure-spreading for several months each year. See Wis. Admin. Code § NR 243.14(9) (requiring CAFOs to have "a minimum of 180 days of storage designed and maintained in accordance with ss. NR 243.15(3)(i) to (k)"). The number of animals at a CAFO corresponds to the amount of animal-generated waste that the CAFO must store. See § NR 243.15(3)(k). If a CAFO fails to properly manage its manure storage, it presents a higher risk of storage overflow and groundwater contamination. National Association of Local Boards of Health, supra at 3. Such failures are hazardous because manure is a breeding ground for many pathogens, including E. coli, and as a result creates a serious risk for disease outbreak if it enters the groundwater. Id. at 8-10. To protect against this risk, Wisconsin regulations require CAFOs to comply with certain regulations such as: (1) effluent limitations, promulgated in Wis. Admin. Code ch. NR 243; and (2) groundwater quality standards. See NR § 243.13(5)(a). With this general background in mind, we proceed to the statutory analysis.

B. Wisconsin Stat. § 227.10(2m)

¶21 The core issue in this case involves Wis. Stat. § 227.10(2m), which dictates that "[n]o agency may implement or enforce any standard, requirement, or threshold . . . unless that standard, requirement, or threshold is explicitly required

14

or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter." (emphasis added).  The parties dispute the meaning of "explicitly required or explicitly permitted" in the context of the DNR imposing conditions upon Kinnard's reissued WPDES permit.

¶22  Kinnard and the Legislature assert that explicit means specific, and that in order for the DNR to impose a condition upon a WPDES permit, without promulgating a rule, that condition must be listed verbatim in a statute or the administrative code. According to Kinnard and the Legislature, because there is no literal enumeration or verbatim mention of an animal unit maximum or off-site groundwater monitoring condition in the statutes or administrative code, Wis. Stat. § 227.10(2m) precludes the DNR from imposing such conditions upon Kinnard's reissued WPDES permit.  Kinnard and the Legislature assert that in the absence of such statutory or administrative authority, the DNR must promulgate a rule in order to impose these conditions upon Kinnard's reissued WPDES permit.

¶23  The DNR and Clean Wisconsin counter that such a reading of "explicitly required or explicitly permitted" is too narrow, and that Kinnard and the Legislature overlook the explicit, but broad, authority given to the DNR in Wis. Stat. § 283.31(3)-(5) to prescribe such conditions.  The DNR and Clean Wisconsin assert that explicit means expressly conferred and clear; and an explicit grant, like that given in § 283.31(3)-(5), can be general and broad in nature.  Said differently, according to the DNR and Clean Wisconsin, an explicit grant of

15

authority does not necessarily have to be circumscribed or exhaustively detailed.

¶24 To resolve this issue of interpreting the term explicit, we examine its dictionary definition and Wis. Stat. § 227.10(2m) in context. Explicit and specific are not synonymous. Black's Law Dictionary defines "explicit" as "clear, open, direct, or exact" and "expressed without ambiguity or vagueness." Explicit, Black's Law Dictionary 725 (11th ed. 2019). Similarly, the American Heritage Dictionary defines explicit as "fully and clearly expressed; leaving nothing implied" and "fully developed or formulated." Explicit, American Heritage Dictionary (5th ed. 2011).

¶25 Additionally, when we review Wis. Stat. § 227.10(2m) in context, we note that in Wis. Stat. § 227.11(2)(a)3., the legislature used the word "specific." See Kalal, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes . . . ."). This context shows us that the legislature knew how to use the word "specific," but did not do so in § 227.10(2m). As a result, we must presume the two words, explicit and specific, mean different things. Because neither the dictionary definition nor an examination of the statute in context supports the premise that the terms explicit and specific are synonyms, we conclude that an agency may rely upon a grant of authority that is explicit but broad when undertaking

16

agency action, and such an explicit but broad grant of authority complies with § 227.10(2m).

## C. Wisconsin Stat. § 283.31(3)-(4)

¶26 Having clarified that explicit authority can be broad in scope, we next examine Wis. Stat. § 283.31(3) and (4), and related regulations, as the parties dispute whether these provisions granted the DNR the explicit authority to impose the animal unit maximum and off-site groundwater monitoring conditions upon Kinnard's reissued WPDES permit.

¶27 Wisconsin Stat. § 283.31(3) allows the DNR to issue a permit "for the discharge of any pollutant, or combination of pollutants . . . upon condition that such discharges will meet all the following, whenever applicable:"

(a) Effluent limitations.

(b) Standards of performance for new sources.

(c) Effluent standards, effluents prohibitions and pretreatment standards.

(d) Any more stringent limitations, including those:

. . .

2. Necessary to comply with any applicable federal law or regulation[.]

. . .

(e) Any more stringent legally applicable requirements necessary to comply with an approved areawide waste treatment management plan.

(f) Groundwater protection standards established under ch. 160.

17

§ 283.31(3).  In this case we are focused on para. a (effluent limitations) and para. f (groundwater protection standards).

¶28 Wisconsin Stat. § 283.31(4) mandates that the DNR "shall prescribe conditions for permits issued under this section to assure compliance with the requirements of sub. (3)." A non-exhaustive list of examples, beginning with the phrase "shall include at least the following," is outlined at § 283.31(4)(a-f).  Therefore, § 283.31(4) requires the DNR to prescribe conditions in a WPDES permit to assure compliance with § 283.31(3); in this case, the parties dispute the imposition of conditions to enforce effluent limitations and groundwater protection standards.  Notably and of import, § 283.31(4) does not say "promulgate rules to assure compliance with the requirements of sub. (3)."  Maple Leaf Farms, Inc. v. DNR, 2001 WI App 170, ¶30, 247 Wis. 2d 96, 633 N.W.2d 720 (stating that "while [] § 283.31(4) directs the DNR to prescribe conditions for permits to assure compliance with water quality standards, the statute does not require the DNR to promulgate such conditions by rule").  Additionally, the text of § 283.31(4) explicitly contemplates the DNR's ability to prescribe conditions for permits that are not enumerated in subs. (a-f) by prefacing that list with the phrase "at least the following."  (emphasis added).

¶29 Before we continue, we must briefly discuss two terms: first, "effluent limitations," Wis. Stat. § 283.31(3)(a); and second, "groundwater protection standards," § 283.31(3)(f).  An effluent limitation is a restriction established by the DNR "on

18

quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into waters of this state." Wis. Stat. § 283.01(6); see also Wis. Stat. § 283.13. In other words, effluent limitations are restrictions on the amount of pollutant a point source may release into bodies of water.[20] As we mentioned above, effluent limitations have been promulgated for CAFOs in Wis. Admin. Code ch. NR 243. For example, and of significance here: (1) CAFOs may not cause the fecal contamination of water in a well, § NR 243.14(2)(b)3; and (2) CAFOs must have 180 days of properly-designed manure storage, § NR 243.15(3)(i-k), to be prepared for long winters when spreading of manure is limited to emergencies.

¶30 The second term we must address is "groundwater protection standards established under ch. 160," as set forth in Wis. Stat. § 283.31(3)(f). The Legislature gave the DNR broad authority to establish, monitor, and enforce health-based groundwater standards in Wis. Stat. ch. 160, which resulted in the promulgation of Wis. Admin. Code ch. NR 140 (February 2021).[21] Chapter 140 contains the State's groundwater standards and provides that the DNR "may take any actions within the context of regulatory programs established in statutes or rules

---

[20] Effluent limitations for CAFOs are based on proper manure and process wastewater storage and land application practices.

[21] All subsequent references to the Wis. Admin. Code ch. NR 140 are to the February 2021 register date unless otherwise indicated.

outside of this chapter, if those actions are necessary to protect public health and welfare or prevent a significant damaging effect on groundwater or surface water quality." § NR 140.02(4). Chapter 140 applies to all facilities regulated by Wis. Stat. ch. 283, including Kinnard's CAFO. § NR 140.03. As discussed above, ch. NR 243 requires CAFOs to comply with groundwater quality standards. See § NR 243.13(5)(a). Having provided some background to § 283.31(3)(a) and (f), we turn to the two permit conditions at issue.

### D. Whether Wis. Stat. § 283.31(3)-(5) Grants the DNR Explicit Authority to Impose The Disputed Conditions

¶31 Having provided background regarding the WPDES permit program, interpreted the "explicit authority" requirement of Wis. Stat. § 227.10(2m), and examined the text of Wis. Stat. § 283.31(3)-(4), we next look at the animal unit maximum and off-site groundwater monitoring conditions to determine whether the DNR had explicit authority to impose these conditions upon Kinnard's reissued WPDES permit.

¶32 We begin by noting that the ALJ imposed both of these conditions after hearing four days of testimony specific to this case and reviewing pre-filed reports. Examining the specific facts surrounding a particular permit application is consistent with how the DNR has historically imposed conditions upon WPDES permits. This case-by-case analysis allows the DNR to use its expertise to make fact-specific determinations and gives it the flexibility to prescribe conditions that are specifically tailored to a particular applicant. See Maple Leaf Farms,

20

247 Wis. 2d 96, ¶31 (noting that the DNR "closely balance[s] the specific needs of the permit holder with public environmental concerns."); Lake Beulah Mgmt. Dist. v. DNR, 2011 WI 54, ¶43, 335 Wis. 2d 47, 799 N.W.2d 73 (reasoning that "[a]s with many [] environmental statutes," the DNR "utilizes its expertise and exercises its discretion to make what, by necessity, are fact-specific determinations.").

### 1. Animal Unit Maximum Condition

¶33 The ALJ concluded that the animal unit maximum condition was necessary to assure Kinnard's compliance with effluent limitations, as enumerated in Wis. Stat. § 283.31(3)(a). We agree.

¶34 The DNR customarily monitors 180-day manure storage requirements through the use of permanent markers. Wis. Admin. Code § NR 243.15(3)(e). However, as the ALJ found, Kinnard had a history of failing to install those markers in 2009 and 2010. The ALJ concluded that without permanent markers, Kinnard had not established an effective means by which to measure the 180-day manure storage requirement. We agree with the ALJ's conclusions on this point. The animal unit maximum condition was a practical means of assuring compliance with the 180-day manure storage requirement——especially in light of Kinnard's failure to effectively measure its manure in the past——and of avoiding the potential hazardous consequences of storage overflow.

¶35 Additionally, Wis. Stat. § 283.31(5) explicitly requires that the DNR issue permits that "specify maximum levels

of discharges."[22]  Limiting the number of animal units at a CAFO is a practical way to quantify and limit the amount of agricultural waste produced and discharged from that CAFO both on-site and off-site, since the number of animal units correlates to the amount of manure and process wastewater produced.

¶36 Accordingly, the DNR had the explicit authority to prescribe the animal unit maximum condition, pursuant to Wis. Stat. § 283.31(4), in order to assure compliance with effluent limitations, as specified in § 283.31(3)(a), and pursuant to § 283.31(5).

### 2. Off-site Groundwater Monitoring Condition

¶37 The ALJ concluded that the installation of two off-site monitoring wells, if practicable, was necessary to assure Kinnard's compliance with effluent limitations and groundwater protection standards pursuant to Wis. Stat. § 283.31(3).  The ALJ further determined that the legislature gave the DNR explicit authority in § 283.31(4) to prescribe permit conditions to assure compliance with these standards.  We agree for two reasons.

¶38 First, the off-site groundwater monitoring condition assures Kinnard's compliance with effluent limitations, primarily Wis. Admin. Code § NR 243.14(2)(b)3, which prohibits

---

[22] We note that Wis. Stat. § 283.31(5), while not mentioned in the ALJ's decision, was cited by the circuit court as a reason for its ruling.

fecal contamination of a well by the landspreading of manure or process wastewater.  Given the overwhelming testimony regarding contaminated wells near Kinnard's CAFO, this condition was essential to ensure that Kinnard did not further contaminate the well water of residents in the vicinity.  Additionally, the susceptibility of this area to groundwater contamination, as defined by § NR 243.15(3)(c)2.a., further supports the ALJ's imposition of this condition in accordance with the DNR's explicit authority.[23]

¶39 Second, the off-site groundwater monitoring condition was necessary to assure Kinnard's compliance with groundwater protection standards.  See Wis. Admin. Code § NR 243.13(5)(a) (requiring that CAFOs comply with groundwater quality standards); § NR 243.13(1) ("The department shall include conditions in a WPDES permit for the production area and ancillary service and storage areas . . . that are necessary to achieve compliance with surface water and groundwater quality standards contained in chs. NR 102 to 105, 140 and 207.").  The record in this case established that as many as 50 percent of private wells in the Town of Lincoln were contaminated, 30 percent of wells had tested positive for E. coli bacteria, and

---

[23] It is also notable that Wis. Admin. Code ch. NR 140 establishes a public health standard for E. coli at zero.  When a preventative action limit for a substance of health or welfare concern, like E. coli, is attained or exceeded ch. NR 140 provides for, among other responses, "the installation and sampling of groundwater monitoring wells."  See § NR 140.24(4).

manure had caused that contamination. Additionally, if the DNR did not have the ability to impose a groundwater monitoring requirement, then the groundwater protection standards would be essentially unenforceable. For these reasons, we conclude that the DNR had the explicit authority to prescribe the off-site groundwater monitoring condition, pursuant to Wis. Stat. § 283.31(4), in order to assure Kinnard's compliance with effluent limitations and groundwater protection standards, as enumerated in § 283.31(3)(a) and (f).[24]

---

[24] The parties dispute whether the former DNR Secretary had the authority to: (1) "reconsider" her initial denial of Kinnard's petition for review under Wis. Admin Code § NR 2.20; and (2) reverse the agency's final decision. We conclude that the issue is moot.

"An issue is moot when its resolution will have no practical effect on the underlying controversy." PRN Assocs., LLC, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559. We generally decline to reach moot issues. Portage County v. J.W.K., 2019 WI 54, ¶12, 386 Wis. 2d 672, 927 N.W.2d 509. However, there are several well-established exceptions where we may elect to address moot issues: (1) "the issues are of great public importance;" (2) "the constitutionality of a statute is involved;" (3) the situation arises so often "a definitive decision is essential to guide the trial courts;" (4) "the issue is likely to arise again and should be resolved by the court to avoid uncertainty;" or (5) the issue is "capable and likely of repetition and yet evades review." Id. (quoted source omitted).

Whether the DNR Secretary complied with the administrative code in "reconsidering" her initial denial of Kinnard's petition is purely academic, and therefore moot. Any resolution will have no practical effect on the underlying controversy since Kinnard's 2012 permit expired and, as of February 1, 2018, it operates under a new WPDES permit and this procedural question is no longer at issue.

24

IV.   CONCLUSION

¶40   We conclude that the DNR had the explicit authority to impose both the animal unit maximum and off-site groundwater monitoring conditions upon Kinnard's reissued WPDES permit, pursuant to Wis. Stat. § 283.31(3)-(5) and related regulations. Accordingly, we affirm the order of the circuit court.

*By the Court*.—The order of the circuit court is affirmed.

¶41 REBECCA FRANK DALLET, J. (*concurring*). I join the majority in full. I write separately to make two points regarding the dissent's[1] use of extrinsic sources in its statutory analysis. First, while I welcome what appears to be a return to a more holistic statutory-interpretation approach, I would dispense with the formalistic requirement that we must first label a statutory term "ambiguous" before we consult extrinsic sources to determine its meaning. Second, not all extrinsic sources are created equal, and the materials the dissent uses——a governor's press release and one legislator's floor statement——are generally unreliable indicators of a statute's meaning.

¶42 To fit its analysis within our current approach to statutory interpretation, the dissent had no choice but to label Wis. Stat. § 227.10(2m) "ambiguous" before it could look to extrinsic sources to analyze the statute's meaning. But as the dissent frames it, a statutory term is ambiguous so long as it is defined differently in multiple dictionaries. Under that framework, it is likely that all statutory terms can be labeled ambiguous and therefore extrinsic sources can always be consulted. I agree with this end result but not the process.

¶43 Instead of requiring that we first label a statute "ambiguous," the better approach is to dispense with the pretext. We should of course start with the text of the

---

[1] In this opinion, "the dissent" refers to Justice Patience Drake Roggensack's dissenting opinion.

1

statute, but our general approach to statutory interpretation should be more comprehensive. Such a holistic methodology would lead to more transparent analyses in which the court is upfront and honest about considering relevant extrinsic sources to interpret a statute's meaning. That includes being transparent about those sources' actual analytical value when they support more than one reasonable inference. See James v. Heinrich, 2021 WI 58, ¶68 n.3, ___ Wis. 2d ___, ___ N.W.2d ___ (Dallet, J., dissenting). Indeed, the court "must engage in an analysis of both the evidence that supports a given interpretation as well as the evidence that contradicts a given interpretation." Fox v. Catholic Knights Ins. Soc'y, 2003 WI 87, ¶44, 263 Wis. 2d 207, 665 N.W.2d 181 (Abrahamson, C.J., concurring). Ultimately, carefully weighed, relevant legislative history can be an indicator of a statute's meaning and thus an important tool in statutory interpretation. See United Am., LLC v. DOT, 2021 WI 44, ¶¶18-19, 397 Wis. 2d 42, 959 N.W.2d 317; State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶66, 271 Wis. 2d 633, 681 N.W.2d 110 (Abrahamson, C.J., concurring).

¶44 Of course, the same extrinsic sources will not be helpful in every case, and some sources are more reliable than others. The extrinsic materials the dissent uses are uninformative and unreliable and therefore have minimal value. There is little to be gleaned about a statute's meaning from a governor's press release and one legislator's floor statement. Then-Governor Walker's press release about what he hoped an initial legislative proposal would achieve says nothing about

2

what the legislature's final enacted text means. Cf., e.g., Landwehr v. Landwehr, 2006 WI 64, ¶25, 291 Wis. 2d 49, 715 N.W.2d 180. As for Representative Tiffany's statement during a floor debate, courts have long recognized that "debates in [the legislature] are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body." See United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 318 (1897); United States v. O'Brien, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). Such cherry picking is why even those who embrace a more holistic approach to statutory interpretation have little use for a single legislator's statement. See Kalal, 271 Wis. 2d 633, ¶¶64-72 (Abrahamson, C.J., concurring).

¶45 Nevertheless, I support the dissent's use of extrinsic sources to inform its statutory analysis. When clear and reliable, such sources can provide valuable context, regardless of whether a statute is ambiguous. The dissent, however, oversells the analytical value of two isolated and unreliable statements, thus leading it astray from the majority opinion's more reasoned interpretation of Wis. Stat. § 227.10(2m). Accordingly, I join the majority opinion.

¶46 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this opinion.

3

¶47 PATIENCE DRAKE ROGGENSACK, J. *(dissenting).* It is the legislative branch of government that enacts statutory laws for Wisconsin. Whether we agree with the policy set forth in those statutes, the words chosen by the legislature control. This case turns on the phrase, "explicitly required or explicitly permitted by statute or by a rule" in Wis. Stat. § 227.10(2m), which statute was enacted as part of 2011 Wis. Act 21. We previously described § 227.10(2m) in Wisconsin Legislature v. Palm, 2020 WI 42, ¶52, 391 Wis. 2d 497, 942 N.W.2d 900.

¶48 In this case, which appears before us on certification, Wis. Stat. § 227.10(2m) is argued to preclude Wisconsin Department of Natural Resources (DNR) from requiring a maximum number of animal units and off-site groundwater monitoring as conditions of a Wisconsin Pollutant Discharge Elimination System (WPDES) permit for Kinnard Farms, Inc.'s concentrated animal feeding operation (CAFO) because no statute or rule explicitly requires or permits that. The majority opinion claims the DNR has the "explicit authority" to condition the WPDES permit because it has broad authority pursuant to "Wis. Stat. § 283.31(3)-(5) and related regulations."[1] In so doing, the majority opinion restores court deference to administrative agency assertions of power that the legislature explicitly limited in Act 21.

---

[1] Majority op., ¶2.

1

¶49 I conclude that there is no explicit textual authority in either statute or rule that grants the DNR power to set a maximum number of animals that Kinnard's CAFO may contain or to require off-site groundwater monitoring wells. Furthermore, Wis. Stat. § 227.11(2)(a)1.-3. preclude agencies from circumventing the "explicitly permitted or explicitly required" directive of Wis. Stat. § 227.10(2m) through the use of broad policy statements from other statutes. Accordingly, the WPDES permit requirements that cap the number of animal units and require groundwater monitoring through off-site wells are unlawful, and should be vacated. Because the majority opinion nullifies § 227.10(2m)'s plainly stated directive that, "No agency may implement or enforce any standard, requirement, or threshold . . . unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule," and in so doing it overturns Act 21's legislative command, I respectfully dissent.

## I. BACKGROUND[2]

¶50 Kinnard operates a large dairy farm in Kewaunee County, which it sought permission to expand. Expansion required DNR approval and securing another WPDES permit for the expanded CAFO.

---

[2] The majority opinion ably sets out the factual background; therefore, I shall narrate only that which is necessary to understand the discussion that follows.

¶51 The requested permit was contested by Clean Wisconsin, Inc. and others (hereinafter Clean Wisconsin) during a lengthy administrative proceeding. The Administrative Law Judge (ALJ) determined that the permit should have specified the maximum number of animals allowed at the new facility and that a groundwater monitoring plan was needed in order to assure compliance with effluent limitations and groundwater protection standards. He recommended two or three off-site groundwater monitoring wells.

¶52 Kinnard sought review of the ALJ decision and ultimately the DNR approved a groundwater monitoring plan, without any off-site wells, and granted the WPDES permit without a cap on the number of animal units. The former DNR Secretary, citing Wis. Stat. § 227.10(2m), concluded that the DNR did not have explicit authority to place those restrictions on the WPDES permit.

¶53 Clean Wisconsin and others sought circuit court review of the DNR decision, in both Kewaunee County and Dane County. The Dane County Circuit Court, upon Clean Wisconsin's motion, consolidated the reviews in Dane County.

¶54 The circuit court vacated the WPDES permit. It concluded that the DNR had authority to impose off-site groundwater monitoring wells and an animal unit maximum cap on the WPDES permit, and the DNR should have complied with the ALJ's recommendation. Kinnard appealed, and the court of appeals certified the appeal to us.

3

¶55 After the matter was certified to us, Governor Evers appointed a new DNR Secretary, who reversed the prior Secretary's position. He embraced the ALJ's requirements of animal unit caps and off-site groundwater monitoring wells for Kinnard's WPDES permit. He relied on Wis. Stat. § 283.31(3) and (4), and did not mention Wis. Stat. § 227.10(2m).

## II. DISCUSSION

### A. Standard of Review

¶56 This is a review of an administrative agency's decision; here, arising from an ALJ decision that the current DNR Secretary has endorsed. On appeal, we review the decision of the DNR, not the decision of the circuit court. Wis. Indus. Energy Grp., Inc. v. Pub. Serv. Comm'n, 2012 WI 89, ¶14, 342 Wis. 2d 576, 819 N.W.2d 240.

¶57 Statutory interpretation and application drive our decision. We independently review questions of statutory interpretation and application. State v. Mercado, 2021 WI 2, ¶32, 395 Wis. 2d 296, 953 N.W.2d 337.

### B. General Principles

¶58 The purpose of statutory interpretation is to determine what the statute means so that it may be applied correctly. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. Statutory interpretation begins with the words chosen by the legislature, i.e., the text of the statute. Id., ¶45.

¶59 "If the words chosen for the statute exhibit a 'plain, clear statutory meaning,' without ambiguity, the statute is

4

applied according to the plain meaning of the statutory terms." State v. Grunke, 2008 WI 82, ¶22, 311 Wis. 2d 439, 752 N.W.2d 769 (quoting Kalal, 271 Wis. 2d 633, ¶46). However, if the statute is "capable of being understood by reasonably well-informed persons in two or more senses[,]" the statute is ambiguous. Kalal, 271 Wis. 2d 633, ¶47.

¶60 When a statute is ambiguous we often consult extrinsic sources such as legislative history. Id., ¶46. However, we also have consulted legislative history to confirm or verify a plain-meaning interpretation. Id., ¶51.

C.  Wisconsin Stat. § 227.10(2m)

¶61 The outcome of this case turns on the interpretation and application of Wis. Stat. § 227.10(2m) to undisputed facts. Section 227.10(2m) provides in relevant part:

> No agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter.

The specific questions that we must address are whether the agency requirements on the WPDES permit that caps the number of animals in the CAFO and requires off-site groundwater monitoring wells are "explicitly required or explicitly permitted by statute or by a rule."

¶62 "Explicitly" is not a statutorily defined term. Therefore, we employ common, ordinary definitions for that term. Pulera v. Town of Richmond, 2017 WI 61, ¶13, 375 Wis. 2d 676,

5

896 N.W.2d 342. We often use a dictionary to find such definitions. State v. Guarnero, 2015 WI 72, ¶16, 363 Wis. 2d 857, 867 N.W.2d 400. As the majority opinion points out, there are many dictionary definitions for "explicit."[3] Reasonably well-informed persons could disagree about which definition best defines explicitly. Accordingly, "explicitly," as employed in Wis. Stat. § 227.20(2m), is ambiguous. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶21, 309 Wis. 2d 541, 749 N.W.2d 581.

¶63 Context also is important to meaning. Id., ¶14. In that regard, we interpret "explicitly required or permitted" in Wis. Stat. § 227.10(2m) in relation to closely-related statutes. Id. Both § 227.10(2m) and Wis. Stat. § 227.11(2)(a)1.-3. were enacted as part of 2011 Wisconsin Act 21; therefore, they are closely related. Their connection is helpful in understanding the meaning of "explicitly," as is the legislative history underlying their enactments.

¶64 For example, what became Act 21 was introduced as Assembly Bill 8 at the request of then-Governor Walker and then-Representative-Tom Tiffany.[4] As A.B. 8 was introduced, then-Governor Walker said that the "legislation will take a multi-pronged approach to improve Wisconsin's regulatory climate

---

[3] Majority op., ¶24, noting that Black's Law Dictionary defines "explicit" as "expressed without ambiguity or vagueness" and American Heritage Dictionary defines "explicit" as "leaving nothing implied."

[4] 2011-2012 Wisconsin Legislature, January 2011 Special Session, Assembly Bill 8, History.

[including prohibiting agencies from] creat[ing] rules more restrictive than the regulatory standards or thresholds provided by the Legislature."[5]  His statement evidences that Act 21 was anticipated to cabin administrative authority so that administrative agencies did not exceed the textual directives from the legislature.

¶65 The importance of the executive's statement as interpretative of an enacted statute is confirmed by United States Supreme Court precedent where recognition of public statements of past presidents have been employed in statutory interpretation.  For example, President Harrison is said to have voiced concerns about the coupling of train cars, when a statute addressing that issue was reviewed.  Johnson v. S. Pac. Co., 196 U.S. 1, 19 (1904) (explaining that "President Harrison, in his annual messages of 1889, 1890, 1891, and 1892, earnestly urged upon Congress the necessity of legislation to obviate and reduce the loss of life and the injuries due to the prevailing method of coupling and braking.").  See also Kathryn Marie Dessayer, Note, The First Word: The President's Place in "Legislative History", 89 Mich. L. Rev. 399, 413-420 (1990) (collecting federal and state cases that have utilized executive branch statements as legislative history).

¶66 Furthermore, the cabining of administrative authority was a definitive change from past practice where administrative

---

[5] Press Release, Scott Walker, Governor of Wisconsin, Special Session Part 2: Regulatory Reform (Dec. 21, 2010).

agencies ordered what they decided was helpful to furthering their administrative concerns and courts upheld such agency actions.[6] See e.g., Maple Leaf Farms, Inc. v. DNR, 2001 WI App 170, ¶13, 247 Wis. 2d 96, 633 N.W.2d 720 (examining DNR authority under Wis. Stat. § 283.31 to regulate off-site manure application because it was related to effluent regulation).

¶67 In Maple Leaf, the court of appeals reasoned that an administrative agency has only those powers "expressly conferred" or that can be "fairly implied" from statutes. Id. The court acknowledged that authority to regulate off-site manure application was not expressly conferred on the DNR by statute. Id. However, because the DNR asserted regulation of off-site application of manure was necessary to furthering its administrative regulation of effluents, the court concluded that it was implied by Wis. Stat. § 283.31's general terms and the DNR prevailed. Id., ¶27. The court explained that "the legislature has conferred authority on the DNR to regulate discharges, in the form of overapplication of manure, by CAFOs, regardless of whether the discharge occurs on land owned by the CAFO." Id.

¶68 Broad grants of administrative power to agencies were regular court practices prior to Act 21.[7] The legislative

---

[6] Prior to Act 21, "[a] mere statement of policy or an interpretation of a statute made in an agency decision in a particular matter with a specific set of facts did not make the statement or interpretation a 'rule' and did not require rule promulgation." Wis. Leg. Council IM-2011-15, 2.

[7] See e.g., State ex rel. Farrell v. Schubert, 52 Wis. 2d
(continued)

history of Act 21 shows that the legislature was cabining administrative regulatory authority as it revised the Wisconsin Administrative Procedure Act. The legislative history underlying Wis. Stat. § 227.10(2m) is helpful to its interpretation. Initially, § 227.10(2m) was written, "No agency may implement or enforce any standard, requirement, or threshold as a term or condition of any license issued by the agency unless such implementation or enforcement is <u>expressly required or permitted</u> by statute or by a rule." 2011 Spec. Sess. A.B. 8 (emphasis added). Senate Amendment 1 changed "expressly" to "explicitly" because, as a sponsoring legislator explained, "courts have interpreted expressly very broadly" and "explicitly" was seen as a stronger limitation on agency authority.[8]

---

351, 358, 190 N.W.2d 529 (1971) (concluding that the special review board had the "implied power to hold hearings and make investigations"); <u>Racine Fire & Police Comm'n v. Stanfield</u>, 70 Wis. 2d 395, 399, 234 N.W.2d 307 (1975) ("It is the general rule that an agency or board created by the legislature has only those powers which are either expressly conferred or which are, by necessity, to be implied from the four corners of the statute under which it operates."); <u>DOA v. DIHLR</u>, 77 Wis. 2d 126, 136, 252 N.W.2d 353 (1977) (same); <u>Peterson v. Nat. Res. Bd.</u>, 94 Wis. 2d 587, 592, 288 N.W.2d 845 (1980) (same); <u>Kimberly-Clark Corp. v. Pub. Serv. Comm'n</u>, 110 Wis. 2d 455, 461-62, 329 N.W.2d 143 (1983) (same); <u>Watkins v. LIRC</u>, 117 Wis. 2d 753, 761, 345 N.W.2d 482 (1984) (same); <u>Tatum v. LIRC</u>, 132 Wis. 2d 411, 421, 392 N.W.2d 840 (1986) (same and also noting that any reasonable doubt regarding the existence of an implied power of an administrative agency should be resolved in the agency's favor); <u>Oneida Cnty. v. Converse</u>, 180 Wis. 2d 120, 125, 508 N.W.2d 416 (1993) (same).

[8] Representative Tom Tiffany, co-sponsor of A.B. 8, floor debate on Senate Amendment 1. We have utilized floor debates as

(continued)

¶69 When interpreting federal statutes, the United States Supreme Court also has relied on statements from legislators as part of legislative history. For example, in Sturgeon v. Frost, 139 S. Ct. 1066, 1085 (2019), the Court reviewed a statutory provision regarding whether the National Park Service (NPS) had the power to regulate the use of hovercraft on the Nation River, which is within ANILCA.[9] In its discussion, the Court reasoned that the legislative sponsor of ANILCA in the House of Representatives "described that provision's effect" as "designed . . . to ensure that ANILCA's new boundary lines would 'not in any way change the status' of the state, Native, and private lands placed within them." Id. (citing 125 Cong. Rec. 11158 (1979)). Therefore, because the use of hovercraft on the Nation River was permitted before the enactment of ANILCA, it continued after enactment, and the NPS could not prohibit such use.

¶70 We employed both Wis. Stat. § 227.10(2m) and Wis. Stat. § 227.11(2)(a)1.-3. in Palm. In doing so, we explained that the "explicit authority requirement is, in effect, a legislatively-imposed canon of construction that requires us to

---

assists in statutory interpretation in the past. See Strenke v. Hogner, 2005 WI 25, ¶¶23-25, 279 Wis. 2d 52, 694 N.W.2d 296 (relating that in "the floor debate on Senate Bill 11, which later evolved into Wis. Stat. § 895.85(3)," Rep. Green responded to Rep. Robson's question about the effect of the bill then under consideration that we employed in our review).

[9] Alaska National Interest Lands Conservation Act (ANILCA).

10

narrowly construe imprecise delegations of power to administrative agencies." Palm, 391 Wis. 2d 497, ¶52. We also noted with approval, a recent law review comment that summarized the interactions among the paragraphs of § 227.11(2)(a)1.-3. as "'prevent[ing] agencies from circumventing this new "explicit authority" requirement by simply utilizing broad statutes describing the agency's general duties or legislative purpose as a blank check for regulatory authority.'" Id. (quoting Kirsten Koschnick, Comment, Making "Explicit Authority" Explicit: Deciphering Wis. Act 21's Prescriptions for Agency Rulemaking Authority, 2019 Wis. L. Rev. 993, 996 (2019)).

¶71 It is critical to note that because we are addressing statutes or rules, i.e., written communications, the explicit requirement or permission that is necessary to satisfy Wis. Stat. § 227.10(2m) must be expressed within the text of the statute or rule from which the agency asserts it was granted the power that it is exercising. Here, the agency has identified no statute or rule wherein the text of the statute or rule even mentions that an agency may establish either a cap on the number of animal units in a CAFO or the requirement for off-site groundwater monitoring wells. Therefore, pursuant to § 227.10(2m), the DNR has no authority to add those requirements to a WPDES permit.

¶72 The DNR relies on statutes that describe the agency's general powers or duties, such as Wis. Stat. § 283.31, a practice that Act 21, through creation of Wis. Stat.

11

§ 227.10(2m) and Wis. Stat. § 227.11(2)(a)1.-3., prevents. The majority opinion follows the lead of the DNR.

### D. Majority Opinion

¶73 The majority opinion concludes first, that "explicit" and "specific" are not synonymous.[10] The majority then cites Wis. Stat. § 227.11(2)(a)3. as support for that distinction because the legislature used "specific" in § 227.11(2)(a)3., but did not use it in Wis. Stat. § 227.10(2m).[11]

¶74 In order to understand Wis. Stat. § 227.11(2)(a)3., it must be read in context, which includes (2)(a)'s directive that "[a]ll of the following apply to the promulgation of a rule interpreting the provisions of a statute enforced or administered by an agency:"

> 1. A statutory or nonstatutory provision containing a statement or declaration of legislative intent, purpose, findings, or policy does not confer rule-making authority on the agency or augment the agency's rule-making authority beyond the rule-making authority that is explicitly conferred on the agency by the legislature.
>
> 2. A statutory provision describing the agency's general powers or duties does not confer rule-making authority on the agency or augment the agency's rule-making authority beyond the rule-making authority that is explicitly conferred on the agency by the legislature.
>
> 3. A statutory provision containing a specific standard, requirement, or threshold does not confer on the agency the authority to promulgate, enforce, or

---

[10] Majority op., ¶24.

[11] Id., ¶25.

12

administer a rule that contains a standard, requirement, or threshold that is more restrictive than the standard, requirement, or threshold contained in the statutory provision.

§ 227.11(2)(a)1.-3.

¶75 As is apparent from Wis. Stat. § 227.11(2)(a)1.-3., that in § 227.11(2)(a)3., the legislature employed "a specific standard, requirement, or threshold" as a means of describing a statute that "explicitly conferred" legislative authority on an administrative agency within the text of the statute, and that such authority was not to be expanded beyond the text the legislature chose.[12]

¶76 The legislature also prohibited the use of declarations of purpose or policy to expand authority delegated to an agency beyond that which was "explicitly conferred" by the text of the statute upon which the agency relies. Wis. Stat. § 227.11(2)(a)1. And further, the legislature prohibited an agency from relying on the agency's general powers or duties to go beyond authority that was conferred on the agency by the explicit text of a statute. § 227.11(2)(a)2. As a recent law review comment pointed out, § 227.11(2)(a)1.-3. keep agency action in check so that it does not supersede statutory textual delegations.[13]

---

[12] Wisconsin Stat. § 227.11(2)(a)1.-3., applies only to agency rulemaking, and there is no rulemaking that underlies this case. However, since it was enacted as part of Act 21, the choice of words the legislature employed is revealing.

[13] Kirsten Koschnick, Comment, Making "Explicit Authority" Explicit: Deciphering Wis. Act 21's Prescriptions for Agency Rulemaking Authority, 2019 Wis. L. Rev. 993, 996 (2019).

13

¶77 As explained above, the majority opinion's reliance on Wis. Stat. § 227.11(2)(a)3. is misplaced because that statute limits agency authority; it does not expand it. In addition, the majority opinion relies on Wis. Stat. § 283.31(3)-(5)'s general statements of purpose to permit agency regulation of the number of animal units on Kinnard's CAFO and off-site groundwater monitoring wells.[14] Section 227.11(2)(a)2. prohibits such an expansion.[15] The majority opinion disregards Wis. Stat. § 227.10(2m)'s requirement that an agency must have explicit textual authority before it may act. In so doing, the majority opinion resurrects an administrative practice that the legislature explicitly prohibited in Act 21.

¶78 First, although Wis. Stat. § 281.31(3) and (4) address water pollutant discharge permits, neither subsection mentions regulating the number of animal units or requiring off-site groundwater monitoring wells. The text of both subsections are general purpose provisions. For example, § 281.31(3) provides that a WPDES permit may be issued subject to effluent limitations.

¶79 Second, DNR rules discuss effluent limitations, but there is no text that mentions animal unit limitations or off-site groundwater monitoring wells for CAFOs. Rather, the cited

---

[14] Majority op., ¶¶2, 16, et seq.

[15] A statute that describes the agency's general powers or duties does not grant authority beyond that which "is explicitly conferred on the agency by the legislature." Wis. Stat. § 227.11(2)(a)2.

14

rules are general requirements that are based on structural requirements and calculations of various volumes of effluents.[16]

¶80 In regard to groundwater protection, which Wis. Stat. § 283.31(3)(f) references, no statute or rule mentions off-site groundwater monitoring wells. Wisconsin Admin. Code § NR 140.01 states the chapter's purpose "is to establish groundwater quality standards for substances detected in or having a reasonable probability of entering the groundwater resources of the state." Wisconsin Admin. Code § NR 214.21 addresses groundwater monitoring requirements, but contains no mention of off-site monitoring wells or caps on the number of animals permitted in a CAFO. Rather, the monitoring wells all are tied to the treatment area and the grade of the site. § NR 214.21(3) and (4).

¶81 Simply stated, the majority opinion takes apart what the legislature enacted in Act 21, and it reinstates control by agency regulation, as was the circumstance in Wisconsin before Act 21. In so doing, a majority of the court steps out of the judicial lane as an interpreter of the law and becomes a maker of law, contrary to the clear directive of the legislature in Act 21.

### III. CONCLUSION

¶82 I conclude that there is no explicit textual authority in either statute or rule that grants the DNR power to set a

---

[16] See e.g., Wis. Admin. Code § NR 243.13(2)(a) and (b).

maximum number of animals that Kinnard's CAFO may contain or to require off-site groundwater monitoring wells. Furthermore, Wis. Stat. § 227.11(2)(a)1.-3. preclude agencies from circumventing the "explicitly permitted or explicitly required" directive of Wis. Stat. § 227.10(2m) through the use of broad policy statements from other statutes. Accordingly, the WPDES permit requirements that cap the number of animal units and require groundwater monitoring through off-site wells are unlawful, and should be vacated. Because the majority opinion nullifies § 227.10(2m)'s plainly stated directive that, "No agency may implement or enforce any standard, requirement, or threshold . . . unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule," and in so doing it overturns Act 21's legislative command, I respectfully dissent.

¶83 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this dissent.

¶84 REBECCA GRASSL BRADLEY, J. *(dissenting).* I join the textual analysis of the operative statutes in Justice Patience Drake Roggensack's dissent, which definitively resolves the questions presented. I write separately to refute Justice Rebecca Frank Dallet's mischaracterization of that writing. Justice Dallet attempts to signal a change in the dissent's approach to statutory interpretation. There is no deviation from our seminal case on statutory interpretation, which expounds textualism. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. The dissent simply applies Kalal, which says "as a general matter, legislative history need not be and is not consulted except to resolve an ambiguity in the statutory language, although legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation." Id., ¶51.

¶85 Although Justice Dallet would prefer that Justice Shirley Abrahamson's concurrence in Kalal govern statutory interpretation in Wisconsin, the method it espoused was affirmatively rejected 17 years ago and this court continues to disavow the sort of results-oriented analysis Justice Dallet now embraces. "We do not . . . endorse the methodology advanced by the[n] chief justice [Shirley Abrahamson] in her concurrence that calls for consultation of extrinsic, non-textual sources of interpretation in every case, regardless of whether the language of the statute is clear. Such an approach subordinates the statutory text and renders the analysis more vulnerable to subjectivity." Id., ¶49 n.8.

1

¶86 Kalal was a "watershed decision in the modern history of the Wisconsin Supreme Court" and is Wisconsin's "most cited case of modern times." Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969, 969-70 (2017). "Kalal transformed statutory interpretation in Wisconsin" and "shift[ed] state courts from a vaguely intentionalist interpretive method" to a "uniform method" focusing upon the plain meaning of the words actually enacted into law. Id. at 970. Justice Dallet seems determined to do away with this mainstream textual method of interpreting statutes, which would usher in an "unusual, freewheeling method of statutory interpretation" that prioritizes results over text. See State v. Hayes, 2004 WI 80, ¶102, 273 Wis. 2d 1, 681 N.W.2d 203 (Sykes, J., concurring).

¶87 While Justice Dallet "would dispense with" what she describes as "the formalistic requirement that we must first label a statutory term 'ambiguous' before we consult extrinsic sources to determine its meaning," it is no mere formality for judges who faithfully interpret statutory text. Concurrence, ¶41. "[T]he rule prevents the use of extrinsic sources of interpretation to vary or contradict the plain meaning of a statute[.]" Kalal, 271 Wis. 2d 633, ¶51. Because it would interfere with the type of results-oriented decision-making the majority employs in this case, Justice Dallet maligns the rule as mere "pretext" and accuses the judges who follow it of being something other than "upfront and honest about considering relevant extrinsic sources to interpret a statute's meaning."

2

Concurrence, ¶43. In doing so, Justice Dallet, once again, simply "misunderstands how to interpret legal texts." _James v. Heinrich_, 2021 WI 58, ¶23 n.12, __ Wis. 2d __, __ N.W.2d __. Absent ambiguity, we do not consult any "extrinsic sources to interpret a statute's meaning" because it is a cardinal rule of statutory interpretation that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Antonin Scalia & Bryan A. Garner, _Reading Law: The Interpretation of Legal Texts_ 56 (2012); _Milwaukee District Council 48 v. Milwaukee Cnty._, 2019 WI 24, ¶21, 385 Wis. 2d 748, 924 N.W.2d 153.

¶88 Although Justice Dallet would abandon it, the textualist method of statutory interpretation is "rooted in and fundamental to the rule of law. Ours is 'a government of laws not men,' and 'it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated. It is the _law_ that governs, not the intent of the lawgiver . . . . Men may intend what they will; but it is only the laws that they enact which bind us.'" _Kalal_, 271 Wis. 2d 633, ¶52 (quoting Antonin Scalia, _A Matter of Interpretation: Federal Courts and the Law_ 17 (1997)).

¶89 Justice Dallet misconstrues the dissent to say "a statutory term is ambiguous so long as it is defined differently in multiple dictionaries." Concurrence, ¶42. Obviously, words often bear different meanings in different contexts. The

3

existence of varying definitions does not give judges a license to declare a statute ambiguous and then rely on extrinsic sources to give a statute a meaning it does not have. "[A] statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses. It is not enough that there is a disagreement about the statutory meaning; the test for ambiguity examines the language of the statute to determine whether well-informed persons should have become confused, that is, whether the statutory . . . language reasonably gives rise to different meanings." Kalal, 271 Wis. 2d 633, ¶47 (quoted source omitted).

¶90 While it is debatable whether reasonable minds may differ on the meaning of "explicit,"[1] there is nothing wrong with consulting the history of a statute to confirm its plain meaning; doing so does not treat such extrinsic sources as authoritative on the meaning of the text. Contrary to Justice Dallet's proffered method of interpretation, legislative history

---

[1] Compare Clean Wisconsin, Inc. v. DNR, 2021 WI __, ¶51, __ Wis. 2d __, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting) (defining "explicit" as "something expressed without ambiguity or vagueness" and "leaving no doubt") with Justice Roggensack's dissent, ¶62.

4

is not "an important tool in statutory interpretation"[2] but a thoroughly discredited one:

> The notion that you can pluck statements from a couple of legislators or even from a committee report, which is usually written by some teenagers, and . . . very often not even read by the committee, much less read by the whole House, much less less read by the other House, . . . [and presume the statements] somehow [are] reflective of the intent of the whole Congress and of the President . . . it truly is the last surviving fiction in American law.[3]

¶91 Justice Dallet's approach would allow judges to misuse legislative history in order to give an unambiguous statute a meaning it does not bear. Adopting her approach would make the law's history superior to the law itself: "The more [you] use[] [legislative history], the more unreliable it's likely to become and the less incentive legislators will have to legislate. After all, canny politicians will have every reason to try to achieve their lawmaking dreams through ever more enterprising

---

[2] Although Justice Dallet cites United America for this proposition, that case actually says the "plain-meaning interpretation of Wis. Stat. § 32.18 fully resolves [the court's] interpretative inquiry," and quotes Kalal's limited allowance for its use: "legislative history is sometimes consulted to confirm or verify a plain-meaning interpretation." United Am., LLC v. DOT, 2021 WI 44, ¶18, 397 Wis. 2d 42, 959 N.W.2d 317 (quoting State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶51, 271 Wis. 2d 633, 681 N.W.2d 110) (emphasis added).

[3] Hoover Inst., Uncommon Knowledge with Justice Antonin Scalia, YouTube, at 17:40 (Oct. 30, 2012), https://www.youtube.com/watch?v=DaoLMW5AF4Y.

uses of legislative history[.]" Neil Gorsuch, A Republic, If You Can Keep It 141 (2019).

¶92 On a final note, Justice Dallet claims the dissent uses "extrinsic sources to inform its statutory analysis." It doesn't. But Justice Dallet persists in promoting, as she has done in multiple cases this term,[4] a results-oriented approach to statutory interpretation to replace the neutral, text-based methodology this court adopted in Kalal——in this case encouraging "ever more enterprising uses of legislative history" to achieve desired outcomes. As it did 17 years ago, this court should resist any impulse to stray from the text in order to shape the law as it may have preferred it to be written. Preservation of the rule of law depends on it.

---

[4] See, e.g., James v. Heinrich, 2021 WI 58, __ Wis. 2d __, __ N.W.2d __ (Dallet, J., dissenting) (advocating to jettison well-established canons of statutory construction in order to reach a desired meaning of Wis. Stat. § 252.03); Schwab v. Schwab, 2021 WI 67, __ Wis. 2d __, __ N.W.2d __ (declining to interpret and follow the plain language of Wis. Stat. § 893.40, as it in part "would produce an unreasonable result that would not advance the statute's purpose").